**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Fast Radius, Inc., *et al.*,[1] | Case No. 22-11051 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF BRIAN WHITTMAN**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Pursuant to 28 U.S.C. § 1746, I, Brian Whittman, do hereby declare, under penalty of perjury, the following to the best of my information, knowledge, and belief:

1.      I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M"), a limited liability corporation, which has served as financial advisor to Fast Radius, Inc., a Delaware corporation, and its debtor affiliates (each, a "Debtor" and, collectively, the "Debtors," "Fast Radius," or the "Company") since June 2022.  I am over the age of 18 and authorized to submit this declaration (this "Declaration") on behalf of the Debtors in the above-captioned chapter 11 cases.  If called as a witness, I would testify competently to the facts set forth in this Declaration.

2.      A&M was engaged by Fast Radius on June 29, 2022, to assist the Company with a review of its liquidity position and this engagement was subsequently expanded on September 12, 2022, to more broadly assist with its restructuring efforts.  I have led the A&M team since the inception of the engagement.  In this capacity, I have familiarized myself with a range of matters concerning the Debtors' finances and capital structure, the Debtors' projected financial

---

1       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: Fast Radius, Inc. (2788), Fast Radius Operations, Inc. (5398) and Fast Radius PTE. LTD (9511).  The corporate headquarters and the mailing address for the Debtors is 113 N. May Street, Chicago, Illinois 60607.

performance, the Debtors' liquidity and the Debtors motions and other matters described herein. Since A&M's engagement in this matter, A&M has been working closely with the Debtors' management and other professionals to assist the Debtors in considering and planning for various restructuring scenarios.

3.      Unless otherwise indicated, the statements set forth in this declaration are based on (i) my personal knowledge or opinion based on my experience; (ii) information that I have received from the Debtors, my colleagues at A&M working directly with me or under my supervision, direction, or control, or other advisors of the Debtors; and/or (iii) my review of relevant documents, including the Plan.  Additionally, the opinions asserted herein are based upon my experience and knowledge of the Debtors' operations, financial condition, and liquidity.  I am not being specifically compensated for this testimony other than through the compensation to A&M as a professional retained by the Debtors.

4.      I am a Managing Director in the Restructuring & Turnaround group at A&M and I am based in A&M's office at 540 West Madison Street, Suite 1800, Chicago, Illinois 60661.  I have held the position of Managing Director at A&M since 2008, and additionally have served as the group's co-head of the Midwest region since 2019.  During my tenure at A&M I also served as interim chief financial officer of Horizon Global in 2018–19, chief restructuring officer of UCI International in 2016, and interim chief financial officer of PSAV, Inc. in 2014.  I joined A&M in 2002, prior to which I spent seven years working in the restructuring group at Arthur Andersen, with my final position as a Director.

5.      A&M is a leading independent global professional services firm with significant experience in advising debtors in complex bankruptcy cases.  A&M specializes in interim management, crisis management, turnaround consulting, operational due diligence, creditor

advisory services, and financial and operational restructuring. A&M's debtor advisory services have included a wide range of activities targeted at stabilizing and improving a company's financial position, including developing and validating forecasts, business plans, and related assessments of a business's strategic position; monitoring and managing cash flow and supplier relationships; and designing and negotiating financial restructuring packages.

6.      I have over twenty-five years of financial restructuring and bankruptcy experience. I have advised companies requiring performance improvement or financial restructuring across a wide range of industries, including automotive, communications, distribution, media, mining, manufacturing, foodservice, retail, and not-for-profit. I have also led complex engagements for companies, secured lenders, and creditors, serving in both interim management and advisory roles. My restructuring engagements include SLI, Appleton Coated, Coriant, Drug Emporium, Edison Brothers Stores, Electro Motive Diesel, EveryWare Global, Horizon Global, and UCI International, Tribune Company, Heartland Automotive Services, Murray Energy, Paddock Enterprises, and Boy Scouts of America.

7.      I have bachelor's degrees in finance and accountancy from the University of Illinois. I am a Certified Insolvency and Restructuring Advisor and a Certified Public Accountant.

8.      This Declaration is being submitted in conjunction with the *Declaration of Lou Rassey, Co-Founder and CEO of Fast Radius, Inc., in Support of Chapter 11 Petitions and First Day Pleadings* (the "Rassey Declaration").[2] The Rassey Declaration sets forth additional background facts regarding the Debtors' historical and recent financial performance and circumstances surrounding the commencement of the chapter 11 cases.

---

2      Capitalized terms used but not defined in this Declaration shall have the meaning given to them in the applicable First Day Motion or the Rassey Declaration, as applicable.

9.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the chapter 11 cases.  The Debtors intend to operate their business and manage their properties as debtors in possession during the pendency of the chapter 11 cases.

10.      This Declaration is submitted in support of the Debtors' chapter 11 petitions and "first day" motions (each a "First Day Motion" and, collectively, the "First Day Motions") which have been filed to minimize the adverse effects of filing for chapter 11 protection and enhance the Debtors' ability to maximize value for the benefit of all of the Debtors' stakeholders.

11.      This Declaration is divided into three parts.  **Part I** of this Declaration describes the Debtors' organizational structure, and prepetition capital structure.  **Part II** describes events leading to this chapter 11 process.  **Part III** sets forth additional relevant facts in support of each of the First Day Motions filed in connection with these chapter 11 cases.

## I.      Overview of Prepetition Structure

### A.      The Debtors' Organizational Structure

12.      As reflected in the Organizational Chart attached hereto as **Exhibit A**, Fast Radius, Inc. and two wholly-owned subsidiaries are Debtors in these chapter 11 cases.

### B.      Prepetition Debt and Equity Structure

13.      As of the Petition Date, the Debtors have approximately $23.8 million in total funded debt obligations, consisting of approximately $7.4 million in aggregate principal amount outstanding under the SVB Facility (as defined below) and $16.5 million in aggregate principal amount outstanding under the SVB Capital Facility (as defined below):

| Debt Instrument | Lender | Maturity | Rate | Outstanding Amount |
|---|---|---|---|---|
| SVB Facility | Silicon Valley Bank | April 3, 2023 | First Tranche: the greater of: (i) one percentage point (1.00%) below the Prime Rate, or (ii) two and one-quarter percent (2.25%). Second Tranche: Prime + 4.25% | $7.4 million |
| SVB Capital Facility | SVB Innovation Credit Fund VIII, L.P. | April 3, 2023 | Prime + 6.0% | $16.5 million |
| | | | **Total Funded Debt** | $23.8 million |

(i)      **SVB Facility**

14.      **SVB Loan Agreement.** Fast Radius[3] and Silicon Valley Bank, as lender ("SVB"), are parties to that certain Loan and Security Agreement dated as of December 29, 2020 (as amended by the First Amendment to Loan and Security Agreement dated as of March 12, 2021, the Second Amendment to Loan and Security Agreement dated as of September 10, 2021, the Third Amendment to Loan and Security Agreement dated as of October 31, 2022, and as may otherwise be amended, restated, amended and restated, modified, or otherwise supplemented from time to time prior to the Petition Date, the "SVB Loan Agreement").

15.      The SVB Loan Agreement provides for a senior secured, two tranche term loan facility with a maximum principal availability of $10 million (the "SVB Facility").

16.      As of the Petition Date, Fast Radius is liable and indebted to SVB in the approximate aggregate principal amount of not less than $7.372 million, plus any other amounts

---

3        While this section references "Fast Radius," as a result of an incomplete name change the "Borrower" under the Prepetition Loan Agreements (as defined below) appears to be Legacy Fast Radius, *i.e.*, Debtor Fast Radius Operations, Inc.

due and payable under the "Loan Documents" as defined in the SVB Loan Agreement (the "<u>SVB Loan Obligations</u>").

17.     **SVB Facility Liens.**  To secure the SVB Loan Obligations, Fast Radius granted to SVB first priority security interests (collectively, the "<u>Prepetition SVB Liens</u>"), subject only to Permitted Liens (as defined in the SVB Loan Agreement) in all Collateral (as defined in the SVB Loan Agreement).

(ii)     **SVB Capital Facility**

18.     **SVB Capital Loan Agreement.**  Fast Radius and SVB Innovation Credit Fund VIII, L.P. (the "<u>SVB Capital</u>" and, together with SVB, the "<u>Prepetition Lenders</u>") are parties to that certain Loan and Security Agreement dated as of September 10, 2021 (as amended by the Consent and First Amendment to Loan and Security Agreement dated as of February 4, 2022, by the Second Amendment to Loan and Security Agreement dated as of March 4, 2022, the Third Amendment to Loan and Security Agreement dated as of October 31, 2022, and as may otherwise be amended, restated, amended and restated, modified, or otherwise supplemented from time to time prior to the Petition Date, the "<u>SVB Capital Loan Agreement</u>" and, together with the SVB Loan Agreement, the "<u>Prepetition Loan Agreements</u>").  Under the SVB Capital Loan Agreement, SVB Capital made two $10 million senior secured term loans.

19.     As of the Petition Date, Fast Radius is liable and indebted to SVB Capital in the approximate aggregate principal amount of $16.468 million, plus any other amounts due and payable under the Loan Documents (as defined in the SVB Capital Loan Agreement) (the "<u>SVB Capital Loan Obligations</u>").

20.     **SVB Capital Liens.**  To secure the SVB Capital Loan Obligations, Fast Radius granted to SVB Capital first priority security interests (collectively, the "<u>Prepetition SVB Capital</u>

Liens" and, together with the SVB Liens, the "Prepetition Liens") in all Collateral (as defined in the SVB Capital Loan Agreement).[4]

### (iii)    Master Subscription Agreement with Palantir Technologies Inc.

21.    In May 2021, Fast Radius Operations, Inc. (formerly known as Fast Radius, Inc.) ("Legacy Fast Radius") entered into a master subscription agreement ("MSA") with Palantir Technologies Inc. ("Palantir") pursuant to which Legacy Fast Radius committed to utilize software and services from Palantir over a period of six years for a total of $45.0 million.  Upon the consummation of the Company's business combination (the "Business Combination") with Legacy Fast Radius on February 2022, the Company made a payment to Palantir of $9.4 million, and the remaining non-cancellable future minimum payments due under the MSA at that time were $10.1 million.

### (iv)    Trade Debt

22.    In the ordinary course of business, the Debtors incur unsecured indebtedness to various suppliers, trade vendors, utility providers, and services providers, among others.  As of the Petition Date, the Debtors' estimated outstanding trade payables are approximately $6.0 million.

### (v)    Common Stock and Warrants

23.    Fast Radius is authorized to issue 350,000,000 shares of common stock with a par value $0.0001.  Shares of Fast Radius's common stock trade on The Nasdaq Stock Market under the symbol "FSRD."  As of the Petition Date, approximately 76 million shares of common stock were outstanding.  While Fast Radius is authorized to issue 1,000,000 shares of preferred stock, none is outstanding as of the Petition Date.

---

4    The SVB Capital Facility is subordinated to the SVB Facility pursuant to an agreement dated September 10, 2019 between SVB and SVB Capital.

24.     Following the business combination, there were 15,516,639 warrants to purchase common stock outstanding, consisting of 8,624,972 public warrants and 6,891,667 private placement warrants held by the Company's initial stockholders.  Each warrant entitles the registered holder to purchase one share of common stock at a price of $11.50 per share.  The warrants expire on February 4, 2027, or earlier upon redemption or liquidation.  Warrants of Fast Radius are also traded on The Nasdaq Stock Market under the symbol "FSRDW."

**C.      The de-SPAC Transaction and the Debtors' Formation**

25.     Fast Radius, in its current structure, was formed through a "de-SPAC" transaction consummated in February 2022.

**(a)      De-SPAC's Generally**

26.     In a typical de-SPAC transaction, a newly formed special purpose acquisition company (the "SPAC") raises funds through an initial public offering ("IPO").  The SPAC then searches for a target company to acquire using the funds raised through the IPO and, potentially, other sources.  The target company is not known when the SPAC is formed or goes public, but SPACs typically focus on acquisitions in specific industries.  Stockholder approval is required prior to consummating an acquisition.  The business combination of the SPAC and the target is referred to as a "de-SPAC" transaction.

27.     Funds raised as part of the SPAC IPO are held in a trust account and stockholders retain the right to redeem their shares for a full return of their initial investment prior to the SPAC closing on an acquisition.  If a stockholder does not redeem its shares, the shares are converted to equity in the surviving entity following the business combination.  Accordingly, the amount of funds a post-acquisition company will have depends directly on the number of shares that are redeemed.

**(b)      Fast Radius Goes Public**

28.      On July 18, 2021, ECP Environmental Growth Opportunities Corp. ("ENNV"), a special purpose acquisition company, entered into that certain Agreement and Plan of Merger (as amended, the "Merger Agreement") with ENNV Merger Sub, Inc., a wholly owned subsidiary of ENNV (the "Merger Sub") and Fast Radius Operations, Inc. (f/k/a Fast Radius, Inc.) ("Legacy Fast Radius"), pursuant to which Merger Sub agreed to merge with and into Legacy Fast Radius, with Legacy Fast Radius surviving the merger as a wholly owned subsidiary of ENNV (the "Merger" and, together with the other transactions contemplated by the Merger Agreement, the "Business Combination").  This transaction was publicly announced on July 19, 2021.

29.      ENNV was a SPAC formed as a Delaware corporation on October 29, 2020, for the purpose of effecting a transaction with one or more businesses.  ENNV was a "blank check" company focused on acquiring a business located in North America concentrated on combatting climate change and improving the overall sustainability of the economy.  Through its IPO, ENNV raised approximately $345 million, which was held in trust pending identification and acquisition of a target.  In July 2021, Fast Radius was identified.

30.      In connection with the execution of the Merger Agreement, ENNV and Legacy Fast Radius also raised (i) $75 million through a private investment in public equity ("PIPE"), through which subscribers agreed to acquire an aggregate of 7,500,000 shares of post-Merger common stock for a purchase price of $10.00 per share and (ii) $25 million through a forward purchase agreement with Goldman Sachs Asset Management, L.P., in its capacity as investment adviser on behalf of its clients ("GSAM"), under which GSAM agreed to acquire 2,500,000 shares of post-Merger common stock either in the open market in advance of the Merger or at the closing of the Merger for a purchase price of $10.00 per share.

31.     At the closing of the Merger, ENNV was renamed "Fast Radius, Inc."  The Business Combination was completed on February 4, 2022.  The PIPE investment closed concurrently with consummation of the Business Combination.

## II.     Events Leading to Chapter 11

### A.     Liquidity Challenges

32.     Fast Radius has faced liquidity challenges and incurred significant operating losses since its inception that frustrate its ability to invest in the growth necessary to attain profitability.

33.     Fast Radius has never been profitable.  It has generated recurring losses that have resulted in accumulated deficits of $215.1 million and $123.5 million as of June 30, 2022 and December 31, 2021, respectively.  Additionally, Fast Radius anticipated a significant cash influx of approximately $300 to $450 million through the Business Combination in February 2022.  However, due to the significant number of shareholder redemptions, it only raised approximately $73 million on a net basis through the Business Combination (after deducting fees and expenses), which has proven insufficient alone to scale to profitability.  Further efforts to raise additional capital since that time have proven unsuccessful to date.

34.     On June 29, 2022, the Company retained A&M, to assist with its cash flow forecast and liquidity planning.

35.     As of September 1, 2022, the Company began owing monthly principal payments under the 2021 SVB Loan Agreement.  The Company made a $2.4 million monthly amortization payment to the Prepetition Lenders on or about the same day, and another on or about October 3, 2022. These required monthly payments exacerbated the Company's liquidity crisis.  Accordingly, on or about October 31, 2022, the Company entered into a loan amendment with its Prepetition

Lenders to defer its November and December 2022 principal payments provided it achieved certain specified milestones.

36.     As of the Petition Date, the Debtors have approximately $6.2 million in available cash.

**B.      Reduction in Force and Other Cost-Saving Measures**

37.     In June 2022, in response to the Company's deteriorating cash position and in consultation with its advisors at A&M, the Company began implementing affirmative steps to extend the Company's cash position, improving projected liquidity by $7.5 million through end of 2022:

38.     <u>Reductions in force</u>.  In June 2022, the Company announced that it was reducing workforce by approximately 50 individuals, including contractors.  In connection with this reduction in force, the Company paid severance of approximately $300,000 to employees eligible under its prepetition severance program.  Further in November 2022, shortly before the Petition Date, the Company reduced its workforce by an additional 38 individuals, resulting in severance payments of approximately $300,000.[5]  Additionally, a number of employees and contractors have voluntarily separated from the Company and have not been replaced, as the Company simultaneously reduced hiring.  Cumulatively, these efforts have reduced the Company's headcount from approximately 287 prior to the June reduction to approximately 182 at the petition date and saved the Company an estimated $4.8 million through the end of 2022.

---

[5]     Contemporaneously therewith, the Company implemented a retention program with respect to its remaining employees.  The majority of eligible employees, including insiders, received payments equal to 4-weeks of their respective salaries.  The total amount of payments under such retention program was approximately $2.4 million.

39.     Reduced marketing.  The Company reduced its marketing spend by $2.2 million, or approximately $400,000 per month, through the end of 2022, while changing its market strategy to utilize its remaining spend more efficiently, reducing its customer acquisition costs.

40.     Operating Expenses and Office Space.  The Company focused on reducing operating expenses through reductions in recruiting, travel and other expenses and delaying office technology and supply replacements.  This will result in a net savings of approximately $300,000 through end of year 2022.  The Company also consolidated office space, resulting in $200,000 in anticipated savings through end of 2022.

41.     Negotiation of Other Liabilities.  In addition to the cost reduction efforts, the Company obtained concessions in the aggregate amount of approximately $17 million in respect of certain historical transaction liabilities and commercial agreements.

**C.      Retention of Professionals**

42.     In June 2022, the Debtors engaged A&M as financial advisor to conduct short-term liquidity analysis and, later, to assist the Debtors in assessing and implementing their strategic alternatives.  In July 2022, the Debtors engaged Citigroup Global Markets Inc. ("Citi") to undertake a marketing process in respect of one or more sale or capital raising transactions.  In August 2022, the Debtors engaged Lincoln Partners Advisors LLC ("Lincoln") to supplement Citi's efforts and expand the scope of potential partners.  In May and June of 2022, the Debtors expanded the engagement of DLA Piper LLP (US) ("DLA") to advise on and assist in implementing both out-of-court and in-court restructuring strategies.

**D.      Fast Radius's Transaction Committee**

43.     On July 7, 2022, the Company appointed a transaction committee (the "Transaction Committee"), comprised of three independent, experienced and disinterested directors, to assist

the full board in reviewing, evaluating, and, if appropriate, executing upon potential strategic transactions. The Transaction Committee has worked closely with the DLA, A&M and Company's investment bankers in analyzing various alternatives available to the Company and has actively overseen the prepetition marketing process.

      **E.**      **Negotiations with the Prepetition Lenders and Consensual Use of Cash Collateral**

44.      Prior to the Petition Date, the Company and its advisors were in regular contact with the Prepetition Lenders regarding the Company's financial situation and strategic alternatives. Beginning in August, those discussions became more frequent.

45.      In late October, the Company and the Prepetition Lenders negotiated a deferral of principal payments on their Prepetition Loan Agreements to help facilitate a potential, out of court transaction. Although the counterparty ultimately determined not to pursue a transaction, the deferrals allowed the Company to preserve essential liquidity at a critical juncture and prepare for a more coordinated filing.

46.      Immediately prior to the Petition Date, the Debtors and the Prepetition Lenders discussed the potential for the consensual use of cash collateral to fund an in-court sale process in the event a consensual out-of-court solution could not be reached. We anticipate that the Prepetition Lenders will consent to the Debtors' use of cash collateral on the terms set forth in the interim cash collateral order filed with the Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Use Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Granting Related Relief (the "Cash Collateral Motion"). The Debtors believe that the proposed form of order is substantially final, though subject to ongoing review and revision in all respects.

47.     The Debtors' access to cash collateral is critical to any in-court process.  Without it, the Debtors would not be able to operate their business or fund the costs of the chapter 11 cases. The Prepetition Lenders' consent facilitates a smoother chapter 11 filing, avoids the costs associated with a contested hearing regarding use of cash, and enables the Debtors to maximize value for all stakeholders.

48.     The Debtors and the Prepetition Lenders engaged in good faith, arm's-length negotiations regarding a workable and reasonable adequate protection package that would provide the Prepetition Lenders with the protections they believe necessary, while also providing the Debtors the means to continue generating revenues and maintain going concern value, to fund the administrative costs of the chapter 11 cases, and to pursue an orderly sale transaction.  These negotiations culminated with the proposed form of cash collateral order filed with the Cash Collateral Motion.

49.     The Debtors, in consultation with their advisors, prepared a weekly cash flow forecast (as may be updated from time to time in accordance with the terms of the Interim Order attached to the Cash Collateral Motion (defined below), the "Budget") reflecting anticipated cash receipts, operating disbursements, and non-operating expenditures, among other things.  The Debtors believe that the Budget establishes that the Debtors will have adequate liquidity through the proposed date for closing a sale in accordance with the Bid Procedures Motion.  The Budget contains line items for cash flows anticipated to be received and disbursed during the period for which the Budget has been prepared.  The Debtors believe that the Budget includes all reasonable, necessary and foreseeable expenses to be incurred in connection with the operation of their business for the covered period.

### III.    First Day Motions

50.    As a result of my first-hand knowledge, and through my review of various materials and information and discussions with members of the Debtors' management and advisors, I have formed opinions as to the necessity of obtaining the relief sought by the Debtors in the First Day Motions, the need for the Debtors to continue to operate effectively while working to maximize the value of their assets for the benefit of all stakeholders, and the immediate and irreparable harm to which the Debtors will be exposed upon the commencement of these chapter 11 cases unless the First Day Motions are granted without delay.

51.    As described more fully below and in the First Day Motions, the relief requested in the First Day Motions was narrowly tailored by the Debtors, in consultation with their advisors, to ensure that the Debtors' immediate operational needs are met, and that the Debtors suffer no immediate and irreparable harm at the outset of these chapter 11 cases.  This is especially important given that the value of the Debtors comes not from significant hard assets but from its intellectual property and the unique software and manufacturing footprint.  I, or my colleagues at my instruction, participated in the analysis that informed each First Day Motion, and assisted in developing the relief requested therein and reviewed the pleadings related thereto.  It is my opinion that the Debtors would suffer immediate and irreparable harm if the relief requested in the First Day Motions is not granted.

#### A.    Joint Administration Motion

52.    By this motion (the "Joint Administration Motion"), the Debtors request entry of an order approving the joint administration of these chapter 11 cases for procedural purposes only. Joint administration will reduce costs and facilitate the administrative process by avoiding the need

for duplicative notices, applications, and orders.  In light of the foregoing, the Debtors respectfully request that the Joint Administration Motion be granted.

### B.    Claims Agent Retention Application

53.    By this motion (the "Claims Agent Retention Application"), the Debtors seek entry of an order authorizing and approving the appointment and retention of Stretto as the claims and noticing agent for the Debtors in their chapter 11 cases.  Stretto is a bankruptcy administrator that specializes in providing comprehensive chapter 11 administrative services, including noticing, claims processing, balloting, and other related administrative aspects of these chapter 11 cases. Given the complexity of these cases and the number of claimants and other parties in interest involved, I believe that appointing Stretto as the claims and noticing agent in these chapter 11 cases is in the best interests of the Debtors' estates and their stakeholders.  Based on the foregoing, I believe that the relief requested in the Claims Agent Retention Application should be approved.

### C.    Creditor Matrix Motion

54.    By this motion (the "Creditor Matrix Motion"), the Debtors seek entry of an order authorizing the Debtors to file a consolidated list of the Debtors' twenty largest unsecured creditors and creditor matrix, to redact or withhold publication of certain personal identification information ("PII"), and to limit certain equity security holdings disclosures.

55.    Specifically, the Debtors seek to redact PII for current and former employees, as well as individual equity holders, as there is little benefit to publication of addresses and other sensitive information of the Debtors' former and current employees and individual equity holders.

56.    Additionally, the Debtors seek to limit certain equity holdings disclosures to only those individuals and entities that hold more than 5% equity in the Debtors.  Debtor Fast Radius, Inc. is a publicly traded company that, as of the Petition Date, had 75,901,646 outstanding shares

of common stock.  The holders of such stock change on a regular basis through active trading, and asking the Debtors to identify each and every shareholder would be an extraordinarily burdensome and expensive undertaking.

57.     For the foregoing reasons, I believe that the relief requested in the Creditor Matrix Motion is in the best interest of the Debtors, their estates, and their creditors, and should therefore be approved.

### D.     Utilities Motion

58.     By this motion (the "Utilities Motion"), and to ensure continued provision of utility services (the "Utility Services") to the Debtors' business, the Debtors seek entry of interim and final orders (a) prohibiting the Debtors' utility service providers (collectively, the "Utility Companies") from altering, refusing, or discontinuing utility service on account of unpaid prepetition invoices, (b) deeming the Utility Companies to be adequately assured of future payment, and (c) establishing procedures for determining additional adequate assurance of future payment and authorizing the Debtors to provide adequate assurance of future payment to the Utility Companies.  The Debtors propose to establish a segregated account into which the Debtors will deposit a sum equal to approximately two weeks of the Debtors' estimated aggregate utility expenses and, additionally, have proposed standard procedures to address any request made by the Utility Companies for additional adequate assurance.

59.     Any disruption of the Debtors' Utility Services would cause irreparable harm to the Debtors' business operations, their estates, and their ability to maximize value through these chapter 11 cases.  For the foregoing reasons, I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors, their estates, and their creditors, and should therefore be approved.

E.       **Taxes Motion**

60.      By this motion (the "Taxes Motion"), the Debtors seek entry of interim and final

orders authorizing the Debtors to pay certain taxes and fees.

61.      In the ordinary course of business, the Debtors are subject to various taxes,

regulatory fees and assessments, and related obligations (collectively, the "Taxes and Fees") that

are payable directly to numerous Taxing Authorities.  The Taxes and Fees sought to be paid include

(i) sales and use taxes, (ii) franchise taxes, (iii) import and customs duties, and (iv) other Taxes

and Fees that are crucial to continuing the Debtors' business.

62.      The Debtors' failure to pay the Taxes and Fees could result in unnecessary penalties

and fees, as well as potential personal liability to the Debtors' directors and officers.  In light of

the foregoing, I respectfully submit that the relief requested in the Taxes Motion should be granted.

F.       **Cash Management Motion**

63.      By this motion (the "Cash Management Motion"), the Debtors seek to continue the

(a) maintenance and use of their existing cash management system, bank accounts, checks and

business forms (including authorizing the Debtors to open and close bank accounts as necessary

in the ordinary course of business), and (b) payment of related prepetition obligations, including

any unpaid bank fees.

64.      The Debtors currently maintain three bank accounts: one with Bank of America

and two with SVB as well as two investment accounts also with SVB.

65.      I believe any disruptions in the cash management system could lead to delays in

satisfying the Debtors' obligations to employees, vendors and suppliers, which could erode value

for the Debtors' estates. Therefore, it is imperative that the Debtors be authorized to continue

operating their cash management system consistent with their historical practice, subject to the limitations proposed in the Cash Management Motion.

66.     In addition, I believe the Debtors' ability to continue to use business forms will minimize expenses to the Debtors' estates and avoid confusion on the part of employees, vendors, and suppliers during the pendency of these chapter 11 cases.

67.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors and all parties in interest, and is a critical part of achieving a smooth transition to chapter 11.

**G.     Vendors Motion**

68.     By this motion (the "Vendors Motion"), the Debtors request authority to pay certain foreign vendors who provide essential services such producing product which is drop-shipped directly to the Debtors' customers, whose services would be almost impossible to replace without significant disruption to the Debtors' business (the "Foreign Vendors").

69.     Further, the Debtors have identified other vendors who may have the potential to assert liens against certain of the Debtors' assets (the "Lien Claimants") and  vendors whose claims may be entitled to priority status under section 503(b)(9) of the Bankruptcy Code because they are undisputed obligations for goods received by the Debtors in the ordinary course of business in the twenty (20) days prior to the Petition Date (the "503(b)(9) Vendors" and, collectively with the Critical Vendors, Lien Claimants and Foreign Vendors, the "Vendors").

70.     Further the Debtors identified additional venders that are critical to their business including where there are no alternative vendors or it would be unduly costly to change vendors or where there are further justifications for payment on account of prepetition claims.  In the ordinary course of business, the Debtors utilize certain critical vendors whose supplies are essential

to the Debtors manufacturing services (the "Critical Vendors").  The Vendors are critical to continuation of the Debtors' business as well as the efficient administration of these chapter 11 cases.  Accordingly, the Debtors are seeking to pay the Vendors' claims subject to certain caps. Further the interim caps proposed are reasonable in light of the Debtors' liquidity position and as compared to the overall size of the Debtors' trade liabilities.

71.     In light of the importance of the continued and uninterrupted service of these Vendors to the Debtors' business, I respectfully submit that the relief requested in the Vendors Motion is essential and should be granted.

**H.     Insurance Motion**

72.     By this motion (the "Insurance Motion"), the Debtors seek to (i) maintain their insurance program and surety bond and honor prepetition and postpetition obligations with respect thereto; and (ii) renew, supplement, modify, extend, terminate, or purchase insurance and surety coverage in the ordinary course of business.

73.     The Debtors maintain various insurance policies providing coverage for, among other things, directors and officers liability, commercial and excess liability, cyber coverage, and products liability (each an "Insurance Policy" and, collectively, the "Insurance Policies").  The Insurance Policies are obtained from various insurance carriers.  The Debtors also maintain a surety bond for certain obligations owing to the U.S. Customs and Border Protection.

74.     I believe the Insurance Policies and the surety bond are essential to the preservation of the value of the Debtors' business, property and assets. Also, I am advised that some of the Insurance Policies are required by various regulations, laws and contracts that govern the Debtors' commercial activities, and that maintaining insurance coverage is required under the Bankruptcy

Code and by the Operating Guidelines for Chapter 11 Cases by the Office of the United States Trustee for Region 3.

75.     As of the Petition Date, the Debtors are current on all of their Insurance Obligations. However, out of an abundance of caution, the Debtors request authority to continue to pay their Insurance Obligations in the ordinary course of business.  In addition, the Debtor's utilize financing for certain of their insurance policies and it is important for that financing to continue uninterrupted.

76.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors and all parties in interest, and is essential to achieving a smooth transition to chapter 11.

### I.      Employee Wage Motion

77.     By this motion (the "Employee Wage Motion"), the Debtors seek to alleviate any personal hardship faced by their Employees as a result of these chapter 11 cases, as well as to maintain the status quo pending the closing of a going concern sale of the Debtors' business.  To that end, the Debtors are seeking authority to pay prepetition wages and other compensation, taxes and withholdings, and reimbursable employee expenses.  The Debtors also seek authority to honor and continue benefit programs for their Employees, which are similar to programs offered by companies comparable in nature and size to the Debtors.

78.     The vast majority of the Debtors' Employees rely primarily or exclusively on the compensation and benefits they receive from the Debtors to pay their daily living expenses and support themselves and their families.  The relief requested in the Employee Wage Motion will help to avoid any Employee hardship, prevent employee attrition and boost morale during this

critical transition period. Further, the Debtors are not seeking to pay any prepetition amounts in excess of the priority claim cap.

79.    In light of the importance of the Employees to the Debtors' business and the reasonable limitations contained in the motion, I respectfully submit that the relief requested in the Employee Wage Motion is critical to the success of the Debtors' chapter 11 cases.

**J.    NOL Motion**

80.    By this motion (the "NOL Motion"), the Debtors seek entry of interim and final orders approving certain notification and hearing procedures related to certain transfers with respect to the Debtors' common stock or any beneficial ownership therein, and directing that any purchase, sale, other transfer of common stock in violation of the procedures shall be null and void *ab initio*.

81.    The Debtors have generated, and are currently generating, a significant amount of tax attributes for U.S. federal and state income tax purposes, such as net operating losses ("NOLs"), capital losses, unrealized built-in losses, and certain other tax and business credits and attributes (the "Tax Attributes").

82.    As of the Petition Date, the Debtors believe they have approximately $50 million of NOLs, as well as other valuable Tax Attributes. While the value of the NOLs may be limited under various scenarios, the Debtors wish to preserve any value that may be available for the benefit of their estates.

83.    Although the value of the Debtors' Tax Attributes are contingent upon the amount of the Debtors' taxable income that may be offset by the Tax Attributes before they expire (certain tax attributes such as NOLS do not expire under current law), the Tax Attributes could translate into potential future tax savings for the Debtors in either the short term or the long term, depending

on statutory limitations on the utilization of tax attributes due to recent changes of control. Thus, there is significant value in these Tax Attributes.

84.     However, unrestricted trading of Fast Radius, Inc. equity securities with no advance warning jeopardizes the Tax Attributes and could impair the value of the Debtors' estates. If no restrictions on trading are imposed by the Court, such trading could severely limit or even eliminate the Debtors' ability to utilize their Tax Attributes, which could lead to significant negative consequences for the Debtors, their estates, creditors and other stakeholders. Thus, the Debtors believe that the relief sought in the NOL Motion will play an integral role in the Debtors' success both during and after these chapter 11 cases, and there is an immediate need to establish the notice and hearing provisions regarding trading in equity securities in Fast Radius, Inc.

**K.     Customer Programs**

85.     By this motion (the "Customer Programs Motion"), the Debtors seek to (i) continue, maintain, pay, honor, administer, renew, replace, implement, or terminate their customer programs in the ordinary course of their business and (ii) to fulfill and honor (through payment, credit, setoff, or otherwise) payments on account of any prepetition obligations related to such programs.

86.     The Debtors historically have provided certain rebates, credits, incentives, discounts, refunds, and other accommodations (the "Historic Customer Programs") to attract and maintain positive relationships with their customers, and they continue to do so in the ordinary course of business (the "Current Customer Programs" and, together with the Historic Customer Programs, the "Customer Programs").

87.     Continuing to administer the Customer Programs without interruption during these chapter 11 cases will help to preserve the Debtors' valuable customer relationships and goodwill, and to maintain operations and drive additional business.  If the Debtors were unable to continue

the Customer Programs on a postpetition or to pay the minimal amounts due and owing on account of the Customer Programs, the Debtors risk placing themselves at a competitive disadvantage in the market.  Continuation of the Customer Programs also could help to ameliorate any customer uncertainty related to the chapter 11 cases and protect the Debtors' reputation.

88.     I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors and all parties in interest, and is essential to the achieving a smooth transition to chapter 11.

**L.      Cash Collateral Motion**

89.     By this motion (the "Cash Collateral Motion"), the Debtors seek authority to use Cash Collateral with the consent of the Prepetition Lenders.  The Debtors require immediate access to liquidity to ensure that they can operate during these chapter 11 cases and pursue an expedited, value-maximizing transaction.  Without prompt access to Cash Collateral, the Debtors would be unable to pay their employees, satisfy trade payables incurred in the ordinary course of business; preserve and maximize the value of their estates; and fund the administration of these chapter 11 cases, which would cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.  The ability to satisfy expenses as and when due is essential.

90.     As of the Petition Date, the Debtors estimate that they have approximately $6.2 million of available cash on hand, substantially all of which is subject to the security interests of the Prepetition Lenders and constitutes Cash Collateral.  The Debtors have determined that existing cash, together with cash generated from operations, is sufficient to bridge to pursue and consummate a value-maximizing transaction for the benefit of all stakeholders, subject to the timeline specified in the proposed bidding procedures.

91.     At this time, the Debtors seek authority to use Cash Collateral on an interim basis pending entry of the Final Order (such interim period, the "Interim Period").  Following extensive arms'-length and good faith negotiations between the Debtors and the Prepetition Lenders, the Debtors anticipate that the Prepetition Lenders will consent to the Debtors' use of Cash Collateral during the Interim Period in accordance with the Budget, subject to permitted variances, on the terms set forth in the Interim Order.  Following the Interim Period, the Debtors will seek authority to continue the consensual use of Cash Collateral in accordance with the Final Order, a proposed form of which will be submitted to the Court before the Final Hearing.

92.     The Debtors, in consultation with their advisors, prepared a weekly cash flow forecast through December 30, 2022 (as may be updated from time to time in accordance with the terms of the Interim Order, the "Budget")[6] reflecting anticipated cash receipts, operating disbursements, and non-operating expenditures, among other things.  The Debtors believe that the Budget establishes that the Debtors will have adequate liquidity through the anticipated close of a transaction as specified in the bid procedures motion on December 12, 2022.  The Debtors believe that the Budget includes all reasonable, necessary and foreseeable expenses to be incurred in connection with the operation of their business for the covered period.

93.     A&M developed the budget the weekly forecast in conjunction with conversations with management, and the forecast has been validated through comparison to actual results gleaned over the last few months.  I believe this forecast is reasonable, however it is subject to risks given the uncertainties that can arise in a chapter 11 process.

---

6        A copy of the Budget is attached to the proposed interim cash collateral order as **Exhibit A**.

94.     Further, I believe that the relief requested in the Cash Collateral Motion is in the best interests of the Debtors' estates, their creditors and all parties in interest, and is essential to the achieving a smooth transition to chapter 11.

**M.     Motion to Shorten Notice with Respect to the Bidding Procedures Motion**

95.     By this motion (the "Motion to Shorten"), the Debtors seek expedited review of their bidding procedures motion.  In July and August of 2022, the Company and its advisors commenced an extensive prepetition marketing process to explore all potential strategic alternatives, including sales and capital markets solutions.  The Debtors' exhaustive prepetition marketing efforts culminated the receipt of an indication of interest from an interested party on October 7, 2022.  Following almost two weeks of negotiations, an exclusivity agreement was executed on October 19, 2022, for a potential acquisition of the Debtors through a cash tender offer with proceeds potentially sufficient to yield a return to equity.  After two weeks of detailed diligence, the counterparty abruptly verbally indicated it was going to withdraw its offer on the afternoon of November 2, 2022, followed by a written termination on November 6, 2022.  Thus, after investing over one month on the potential transaction, the Debtors were left with limited liquidity and forced to pivot to an expedited filing for chapter 11.

96.     The Debtors and their advisors are poised to move quickly to work with interested parties over this compressed timeframe and leverage four months of prepetition marketing efforts to consummate a value-maximizing transaction for the benefit of the Debtors' stakeholders.

97.     I believe that the relief requested in the Motion to Shorten is in the best interests of the Debtors' estates, their creditors and all parties in interest, and is essential to the achieving the goals of these chapter 11 cases.  Given the liquidity forecast, it is essential to provide certainty around the bid process and the deadlines established in the bid procedures motion as soon as

possible in order to provide a path to maximizing recovery to creditors within the window of time available. As part of the prepetition marketing process, the Company and its advisors worked to identify potential sources for financing, including debtor in possession financing to extend the timeline to bridge to consummation of a sale transaction. Unfortunately, due to the Debtors' asset profile and their prepetition secured lenders' unwillingness to provide incremental liquidity (or to consent to being primed), the Company has no present offers for postpetition funding.

        **N.**      **Bid Procedures Motion**

98. By this motion (the "<u>Bid Procedures Motion</u>"), the Debtors seek to (i) establish certain bidding procedures for the marketing and, potentially, the sale of all or substantially all of the Debtors' assets, (ii) schedule certain dates for the potential sale of their assets, (iii) approve the form and manner of notice thereof, and (iv) establish certain assumption and assignment procedures.

99. As the Debtors are left with limited liquidity, the Bid Procedures Motion seeks approval of an expedited but reasonable sale process timeline which culminates in a sale closing date of December 12, 2022. Further, although no Stalking Horse Bidder has been identified at this time, the Bid Procedures Motion requests that the Debtors be allowed to select a Stalking Horse Bidder and provide them with certain bid protections in order to provide the Debtors with further ability to maximize their assets.

100. I believe that the relief requested in the Bid Procedures Motion is in the best interests of the Debtors' estates, their creditors and all parties in interest, and is essential to the achieving the goals of these chapter 11 cases. Especially in light of the current liquidity forecast, it is essential to provide certainty around the bid process and the deadlines established in the Bid

Procedures Motion as soon as possible in order to provide a path to maximizing recovery to creditors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

*/s/ Brian Whittman*
Brian Whittman

## Exhibit A

**Organization Chart**

# FAST RADIUS ORGANIZATION CHART

