**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Fast Radius, Inc., *et al*.,[1] | Case No. 22-11051 (JKS) |
| Debtors. | (Jointly Administered) |

**COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN**

**DLA PIPER LLP (US)**
R. Craig Martin (DE 5032)
1201 N. Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: craig.martin@us.dlapiper.com

Rachel Ehrlich Albanese (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
Email: rachel.albanese@us.dlapiper.com

W. Benjamin Winger (admitted *pro hac vice*)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Email: benjamin.winger@us.dlapiper.com

*Co-Counsel for the Debtors*

Dated:  December 19, 2022

**BAYARD, P.A.**
Daniel N. Brogan (No. 5723)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
Email: dbrogan@bayardlaw.com

*Co-Counsel for the Debtors*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Fast Radius, Inc. (2788), Fast Radius Operations, Inc. (5398) and Fast Radius PTE. LTD (9511).  The corporate headquarters and the mailing address for the Debtors is 113 N. May Street, Chicago, Illinois 60607.

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION .....................................2

ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS .......................................................16

    2.1     **ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS** ................16

    2.2     **PROFESSIONAL FEE CLAIMS** ................................................................17

ARTICLE III CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES ...................................................................................................17

    3.1     **GENERAL RULES OF CLASSIFICATION** ...........................................17

    3.2     **UNIMPAIRED CLASS OF CLAIMS** ........................................................20

    3.3     **IMPAIRED CLASSES OF CLAIMS & INTERESTS** ...............................21

ARTICLE IV BACKGROUND AND DISCLOSURES .............................................................23

    4.1     **GENERAL BACKGROUND.** ....................................................................23

    4.2     **EVENTS LEADING TO CHAPTER 11.** ..................................................29

    4.3     **THE CHAPTER 11 CASES.** ......................................................................30

ARTICLE V CONFIRMATION AND VOTING PROCEDURES ............................................36

    5.1     **CONFIRMATION PROCEDURE.** ...........................................................36

    5.2     **PROCEDURE FOR OBJECTIONS** ..........................................................36

    5.3     **REQUIREMENTS FOR CONFIRMATION** .............................................36

    5.4     **CLASSIFICATION OF CLAIMS AND INTERESTS.** ..............................37

    5.5     **IMPAIRED CLAIMS OR INTERESTS.** ...................................................38

    5.6     **CONFIRMATION WITHOUT NECESSARY ACCEPTANCES** .................39

    5.7     **FEASIBILITY** ...........................................................................................40

    5.8     **BEST INTERESTS TEST AND LIQUIDATION ANALYSIS** .....................40

    5.9     **RELEASES & EXCULPATIONS.** ...............................................................41

    5.10    **ACCEPTANCE OF THE PLAN** .................................................................42

ARTICLE VI CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING........42

    6.1     **THE PLAN MAY NOT BE ACCEPTED.** ..................................................43

    6.2     **THE PLAN MAY NOT BE CONFIRMED.** ...............................................43

    6.3     **DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS UNDER THE PLAN MAY BE INCONSISTENT WITH PROJECTIONS.** ...............43

    6.4     **OBJECTIONS TO CLASSIFICATION OF CLAIMS.** ................................43

    6.5     **FAILURE TO CONSUMMATE THE PLAN.** .............................................44

i

6.6 **ALLOWANCE OF CLAIMS MAY SUBSTANTIALLY DILUTE THE RECOVERY TO HOLDERS OF CLAIMS UNDER THE PLAN**..................................................................44

6.7 **PLAN RELEASES MAY NOT BE APPROVED.**...........................45

6.8 **CERTAIN TAX CONSIDERATIONS.**...................................45

ARTICLE VII MEANS OF IMPLEMENTING THE PLAN ..............................45

7.1 **GENERAL**.................................................................45

7.2 **SALE TRANSACTION & SOURCES OF CONSIDERATION FOR PLAN DISTRIBUTIONS**....................................................46

7.3 **WIND-DOWN DEBTOR** ..............................................46

7.4 **PLAN ADMINISTRATOR**.............................................47

7.5 **CANCELLATION OF EXISTING SECURITIES AND AGREEMENTS.**.......................................................50

7.6 **EXEMPTION FROM CERTAIN TRANSFER TAXES** ...............50

7.7 **PALANTIR SETTLEMENT.**...........................................50

7.8 **PRESERVATION OF RETAINED ACTIONS** ........................51

7.9 **SALE OF HP PRINTERS** .............................................52

7.10 **CREDITORS' COMMITTEE** ........................................52

7.11 **CLOSING THE CHAPTER 11 CASES** ..............................53

ARTICLE VIII SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS .................................................................53

8.1 **COMPROMISE, SETTLEMENT, AND RELEASE OF CLAIMS AND INTERESTS** .....................................................53

8.2 **RELEASE OF LIENS** .................................................53

8.3 **RELEASES BY THE DEBTORS.** ....................................54

8.4 **THIRD-PARTY RELEASE.**............................................54

8.5 **EXCULPATION.**........................................................55

8.6 **INJUNCTION.**..........................................................56

8.7 **CONSENSUAL NON-DEBTOR RELEASES** ......................56

8.8 **RELEASES SUBJECT TO INVESTIGATION** ......................56

8.9 **INDEMNIFICATION OBLIGATIONS** ...............................56

8.10 **SETOFFS** ..............................................................57

8.11 **BINDING EFFECT** ...................................................57

8.12 **TERMS OF INJUNCTIONS OR STAYS** ............................57

ARTICLE IX EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..............57

EAST\198340363.11

9.1 **REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ........................................................................57

9.2 **SUPPLEMENTAL BAR DATE FOR REJECTION DAMAGES** .................58

ARTICLE X DISTRIBUTIONS ..........................................................................58

10.1 **DISTRIBUTIONS FOR CLAIMS ALLOWED AS OF THE EFFECTIVE DATE** ........................................................................58

10.2 **NO DISTRIBUTIONS ON DISPUTED CLAIMS** ..............................58

10.3 **DISTRIBUTIONS ON CLAIMS ALLOWED AFTER THE EFFECTIVE DATE** ........................................................................58

10.4 **OBJECTIONS TO AND ESTIMATION OF CLAIMS** ........................58

10.5 **DELIVERY OF DISTRIBUTIONS AND UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS** ....................................................59

10.6 **INTEREST ON CLAIMS** ...........................................................60

10.7 **WITHHOLDING AND REPORTING REQUIREMENTS** ....................60

10.8 **MISCELLANEOUS DISTRIBUTION PROVISIONS.** .........................60

10.9 *DE MINIMIS DISTRIBUTION PROVISIONS* ...................................61

10.10 **DISTRIBUTION RECORD DATE** ...............................................61

ARTICLE XI CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ...........61

11.1 **CONDITIONS TO EFFECTIVE DATE** ..........................................61

11.2 **SUBSTANTIAL CONSUMMATION** ..............................................61

11.3 **CONSEQUENCES OF NON-OCCURRENCE OF EFFECTIVE DATE** ..................................................................................62

ARTICLE XII ADMINISTRATIVE PROVISIONS ..................................................62

12.1 **RETENTION OF JURISDICTION** ................................................62

12.2 **PRESERVATION OF EXCLUSIVITY** ...........................................64

12.3 **AMENDMENTS.** .....................................................................64

12.4 **WITHDRAWAL OF PLAN.** .......................................................64

12.5 **SUCCESSORS AND ASSIGNS** ..................................................64

12.6 **GOVERNING LAW** ................................................................64

12.7 **CORPORATE ACTION** ............................................................64

12.8 **EFFECTUATING DOCUMENTS AND FURTHER TRANSACTIONS** ...................................................................64

12.9 **CONFIRMATION ORDER AND PLAN CONTROL** ..........................65

12.10 **NOTICES.** ............................................................................65

12.11 **NO ADMISSIONS OR WAIVER** ................................................65

ARTICLE XIII RECOMMENDATION AND CONCLUSION ......................................65

## **DISCLAIMER**

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PROPONENT, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

THE COMBINED DISCLOSURE STATEMENT AND PLAN CONTEMPLATES THE LIQUIDATION OF THE DEBTORS, AND PAYMENTS TO CERTAIN CREDITORS, AS ADMINISTERED BY A PLAN ADMINISTRATOR PURSUANT TO THE TERMS HEREOF.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN WHAT IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. NO REPRESENTATIONS CONCERNING THE DEBTORS, OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND THE DEBTORS' SCHEDULES. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND THEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION

1125 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3016(b), AND LOCAL RULE 3017-2, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

SEE ARTICLE VI OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.

## **INTRODUCTION**

Fast Radius, Inc., Fast Radius Operations, Inc., and Fast Radius PTE. LTD., as debtors and debtors in possession in these Chapter 11 Cases, propose this Combined Disclosure Statement and Plan for the treatment of the Debtors' remaining assets and Distribution of the proceeds of the Estates' assets to the Holders of Allowed Claims against the Debtors as set forth herein. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

This Combined Disclosure Statement and Plan contains, among other things, a discussion of the Debtors' history, businesses, properties, operations, the Chapter 11 Cases, risk factors, summary and analysis of this Plan, and certain other related matters.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ARE ENCOURAGED TO READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND IN THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE, OR WITHDRAW THE PLAN, OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

## **ARTICLE I**
## **DEFINED TERMS AND RULES OF INTERPRETATION**

**Defined Terms**

1.1    "Administrative Claim" shall mean an unsecured Claim for payment of costs or expenses of administration specified in Bankruptcy Code sections 503(b), 507(a)(2), 507(b), or 1114(e)(2), including: (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Debtors' estates and operating the business of the Debtors; and (b) Professional Fee Claims.

2

1.2     "Administrative Claim Bar Date" shall mean the deadline for filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which shall be the date that is thirty (30) days after the Effective Date.

1.3     "Affiliate" shall mean "affiliate" as defined in section 101(2) of the Bankruptcy Code.

1.4     "Allowed" shall mean with respect to any Claim, except as otherwise provided in the Plan:  (a) a Claim that is either (i) scheduled by the Debtors in their Schedules in a liquidated amount and not listed as contingent, unliquidated, zero, undetermined, or disputed; or (ii) asserted in these Chapter 11 Cases by a proof of claim which has been timely filed, or deemed timely filed, with the Claims Agent in accordance with the procedures set forth in the Bar Date Order or late filed with leave of the Bankruptcy Court; and (b) a Claim that is either (i) not objected to within the period fixed by the Bankruptcy Code, the Bankruptcy Rules, and/or applicable orders of the Bankruptcy Court; or (ii) that has otherwise been allowed by a final order or pursuant to the Plan.  An Allowed Claim: (y) includes a previously Disputed Claim to the extent such Disputed Claim becomes allowed when the context so requires, and (z) shall be net of any valid setoff amount, which amount shall be deemed to have been set off in accordance with the provisions of the Plan.  For the avoidance of doubt:  (aa) any Claim that is withdrawn shall not be an Allowed Claim; (bb) any proof of claim filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim; (cc) except as otherwise specified in the Plan or any Final Order, and except for any Allowed Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date; and (dd) the Debtors or Wind-Down Debtor may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law. "Allow" and "Allowing" shall have correlative meanings.

1.5     "Amended Schedules Bar Date" shall have the meaning ascribed to it in Section 4.3(e)(iii) herein.

1.6     "Ballot" shall mean the form approved by the Bankruptcy Court and distributed to Holders of Claims entitled to vote on this Plan on which is to be indicated an acceptance or rejection of this Plan and the election described in Section 5.10 hereof.

1.7     "Bankruptcy Code" shall mean title 11 of the United States Code, as now in effect or hereafter amended.

1.8     "Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware.

1.9     "Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure and the Local Rules.

1.10     "Bar Date" shall mean, with respect to any particular Claim, the specific date set forth in the Bar Date Order or in this Plan as the last day for filing a proof of claim or a

request for allowance of an Administrative Claim or a proof of interest against the Debtors in these Chapter 11 Cases for that specific Claim.

1.11    "Bar Date Order" shall mean that certain *Order (I) Establishing Deadlines for Filing Proofs of Claim, Including Section 503(b)(9) Claims, (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief* [D.I. 112], entered by the Bankruptcy Court on November 30, 2022.

1.12    "Bidding Procedures Motion" shall mean the *Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures for the Potential Sale of Certain of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Assumption and Assignment Procedures, and (V) Granting Related Relief* [D.I. 17].

1.13    "Bidding Procedures Order" shall mean that certain *Order (I) Approving Bidding Procedures for the Potential Sale of Certain of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Assumption and Assignment Procedures, and (V) Granting Related Relief* [D.I. 77], entered by the Bankruptcy Court on November 14, 2022.

1.14    "Business Combination" shall mean all transactions contemplated by the Merger Agreement.

1.15    "Business Day" shall mean any day, other than a Saturday, Sunday, or a legal holiday (as used in Bankruptcy Rule 9006(a)).

1.16    "Cash" shall mean legal tender of the United States of America or its equivalents, including but not limited to bank deposits, checks, and other similar items.

1.17    "Cash Collateral Orders" shall mean the Interim Cash Collateral Order [and the Final Cash Collateral Order], including any exhibits and annexes attached thereto, entered by the Bankruptcy Court approving, among other things, the Debtors' use of cash collateral and parties' rights with respect thereto.

1.18    "Causes of Action" shall mean any and all actions, suits, claims for relief, causes of action, Chapter 5 Causes of Action, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise, whether arising prior to or after the Petition Date. Causes of Action include, but are not limited to, those Causes of Action listed on a schedule to be filed with the Plan Supplement, which exhibit may be modified up through and including the Effective Date. For the avoidance of doubt, Causes of Action shall not include any claims or causes of action transferred to the Purchaser pursuant to the Purchase Agreement.

1.19    "Chapter 5 Causes of Action" shall mean any and all actual or potential claims and causes of action arising under Chapter 5 of the Bankruptcy Code, including claims, rights, and causes of action arising under sections 510, 544, 545, 547, 548, 549, 550, 551, and

4

553(b) of the Bankruptcy Code, including but not limited to, the recovery of preferences and fraudulent transfers from any Entity that received cash or any other interest in property from any Debtor. For the avoidance of doubt, Chapter 5 Causes of Action shall not include any claims or causes of action transferred to the Purchaser pursuant to the Purchase Agreement.

1.20    "Chapter 11 Cases" shall mean these Chapter 11 Cases commenced by the Debtors and jointly administered under case number 22-11051 (JKS) in the Bankruptcy Court.

1.21    "Citi" shall mean Citigroup Global Markets Inc.

1.22    "Claim" shall mean a claim, as such term is defined in Bankruptcy Code section 101(5), against any of the Debtors.

1.23    "Claims Agent" shall mean the Debtors' claims, noticing and solicitation agent, Stretto, Inc.

1.24    "Class" shall mean a group of Claims or Interests described in Article III of this Plan.

1.25    "Closing Date" shall mean December 16, 2022, the date upon which the Debtors and the Purchaser consummated the Sale Transaction.

1.26    "Combined Disclosure Statement and Plan" means this combined disclosure statement and chapter 11 plan, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

1.27    "Company" shall mean, collectively, Fast Radius, Inc., Fast Radius Operations, Inc. and Fast Radius PTE. LTD prior to the Petition Date.

1.28    "Common Stock" shall mean (a) the delisted common stock that traded on the Nasdaq Capital Market under the symbol "FSRD" and (b) the Warrants.

1.29    "Committee" shall mean the Official Committee of Unsecured Creditors appointed by the U.S. Trustee on November 18, 2022 (as subsequently amended) [D.I. 83, 90, and 116].

1.30    "Confirmation Date" shall mean the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

1.31    "Confirmation Hearing" shall mean the first hearing held by the Bankruptcy Court to consider confirmation of the Plan.

1.32    "Confirmation Order" shall mean an order of the Bankruptcy Court confirming this Plan pursuant to, among others, section 1129 of the Bankruptcy Code.

1.33    "Debtors" shall mean each of Debtor Fast Radius, Inc., Debtor Fast Radius Operations, Inc., and Debtor Fast Radius PTE. LTD.

1.34    "Disallowed" shall mean, when used in reference to a Claim, all or that portion, as applicable, of any Claim that has been disallowed under the Combined Disclosure Statement and Plan, the Bankruptcy Code, applicable law or by a Final Order.

1.35    "Disclosure Statement" shall mean the disclosure statement, as amended, supplemented or modified from time to time, that is embodied within this Combined Disclosure Statement and Plan and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, Local Rule 3017-1, and other applicable law.

1.36    "Disputed" shall mean, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

1.37    "Distribution" shall mean the distribution of Cash and other non-Cash consideration, including mutual releases, as the case may be, in accordance with the Plan.

1.38    "Distribution Address" shall mean the address set forth in (a) the Proof of Claim filed by the Holder, (b) any written notice of address change delivered to the Debtors after the date of filing of any related Proof of Claim, (c) the Schedules, if no Proof of Claim has been filed and the Debtors have not received a written notice of a change of address, (d) the other records of the Debtors at the time of the Distribution if no Proof of Claim has been filed, the Debtors have not received a written notice of a change of address, and the Schedules do not include an address, or (e) any change of address as reflected on the Bankruptcy Court docket.

1.39    "Distribution Date" shall mean the date determined by the Plan Administrator when Distributions shall be made under the Plan.

1.40    "Distribution Record Date" shall mean the record date for purposes of making Distributions under this Plan on account of Allowed Claims, which date shall be the first day of the Confirmation Hearing, or such other date as is designated in a Final Order of the Bankruptcy Court.

1.41    "Effective Date" shall mean the first date on which all of the conditions of Section 11.1 of the Plan have been satisfied or have been waived in writing and the Debtors declare the Plan effective. For the avoidance of doubt, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

1.42    "Entity" shall have the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.43    "Estate" shall mean the estate of each Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases on the Petition Date and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Effective Date.

1.44    "Estimation Order" shall mean an order or orders of the Bankruptcy Court estimating for voting and/or Distribution purposes (under section 502(c) of the Bankruptcy Code) the amount of any Claim, or the aggregate (and if applicable, individual) Face Amount of Disputed Claims in each relevant Class. The defined term Estimation Order includes the Confirmation

Order if the Confirmation Order grants the same relief that would have been granted in a separate Estimation Order.

1.45    "Exculpated Parties" shall mean, each in their respective capacities as such, (a) the Debtors; (b) the Committee; and (c) the Related Parties of each of the foregoing in each case as to the Persons and entities in this clause (c) to the extent such Person or Entity is a fiduciary of any of the Estates (including, without limitation, as an officer or director of the Debtors).

1.46    "Executory Contract or Lease" shall mean a contract or lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.47    "Face Amount" shall mean (a) with respect to any Claim for which a proof of claim is filed, an amount equal to:  (i) the liquidated amount, if any, set forth therein, or (ii) any other amount set forth in an Estimation Order; or (b) with respect to any Claim scheduled in the relevant Debtor's Schedules, but for which no proof of claim is timely filed, the amount of the Claim scheduled as undisputed, noncontingent, and liquidated.

1.48    "Fast Radius" shall mean the Company or the Debtors, as applicable.

1.49    "Fast Radius Operations" shall mean Fast Radius Operations, Inc. (*f/k/a* Fast Radius, Inc. and Fast Radius, LLC).

1.50    "File," "Filed," or "Filing" shall mean, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in these Chapter 11 Cases.

1.51    "Final Cash Collateral Order" shall mean the [__] [D.I. [__].

1.52    "Final Order" shall mean an order or judgment of the Bankruptcy Court, as entered on the docket of the Bankruptcy Court, that has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, seek review, rehearing, or to file a petition for certiorari has expired and no timely filed appeal or petition for review, rehearing, remand, or certiorari is pending, or (b) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; *provided*, *however*, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or other rules governing procedure in cases before the Bankruptcy Court, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.53    "First Day Declarations" shall mean the Rassey Declaration and the Whittman Declaration.

1.54    "General Unsecured Claim" shall mean a Claim that is not (a) an Administrative Claim, (b) a Priority Tax Claim, (c) an Other Priority Claim, (d) a Prepetition Lender Secured Claim, (e) a Section 510(b) Claim, or (f) an Interest.  For the avoidance of doubt, the Prepetition Lender Deficiency Claim shall be treated as a General Unsecured Claim for all purposes hereunder.

1.55    "General Bar Date" shall have the meaning ascribed to it in Section 4.3(e)iii(1) herein.

1.56    "Governmental Unit" shall have the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

1.57    "Governmental Bar Date" shall have the meaning ascribed to it in Section 4.3(e)iii(1) herein.

1.58    "GUC Recovery" shall mean, after the full and final satisfaction of all Allowed Administrative Claims, Allowed Priority Tax Claims, U.S. Trustee Fees, and Allowed Other Priority Claims, the net Cash proceeds, if any, from monetizing the Residual Assets in which **neither** the Prepetition Lenders' **nor** any other parties' interests are secured by a Lien that is valid, perfected, and enforceable pursuant to applicable law or by reason of Bankruptcy Court order, including the Cash Collateral Orders.

1.59    "Holder" or "Holders" shall mean a Person or an Entity holding a Claim or Interest.

1.60    "Impaired" shall mean, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.61    "Impaired Class" shall mean a Class of Claims or Interests that is Impaired.

1.62    "Insider" shall have the meaning ascribed to such term in section 101(31) of the Bankruptcy Code.

1.63    "Intercompany Claims" shall mean any Claim held by a Debtor against another Debtor, including, without limitation: (a) any account reflecting intercompany book entries by a Debtor with respect to another Debtor, (b) any Claim not reflected in such book entries that is held by a Debtor against another Debtor, and (c) any derivative Claim asserted by or on behalf of one Debtor against another Debtor.

1.64    "Intercompany Interests" shall mean any Interest held by a Debtor against another Debtor.

1.65    "Interest" shall mean an equity security, within the meaning of section 101(16) of the Bankruptcy Code, in or Common Stock of the Debtors.

1.66    "Interim Cash Collateral Order" shall mean the *Interim Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [D.I. 61].

1.67    "Interim Approval and Procedures Order" shall mean that certain *Order Approving the Disclosure Statement; Approving the Solicitation and Voting Procedures; Scheduling the Plan Confirmation Process and Granting Related Relief* [D.I. [•]].

1.68    "Lien" shall mean: (a) a judicial lien as defined in section 101(36) of the Bankruptcy Code; (b) a lien as defined in section 101(37) of the Bankruptcy Code; (c) a security interest as defined in section 101(51) of the Bankruptcy Code; (d) a statutory lien as defined in section 101(53) of the Bankruptcy Code; and (e) any other lien, interest, charge, or encumbrance.

1.69    "Local Rules" shall mean the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware as now in effect or hereafter amended.

1.70    "Objection(s)" shall mean any objection, application, motion, complaint, or any other legal action seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, establish the priority of, expunge, subordinate, or estimate any Claim (including any objection or opposition to any request for allowance or payment of any Administrative Claim).

1.71    "Other Priority Claim" shall mean any Claim entitled to priority under sections 503(b) or 507(a)(2) of the Bankruptcy Code that is not a Priority Tax Claim.

1.72    "Other Secured Claim" shall mean any Secured Claim, including a Secured Tax Claim, other than the SVB Claim and the SVB Capital Claim.

1.73    "Person" shall mean any individual, corporation, partnership, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, governmental unit, or any political subdivision thereof, the Committee, Holders of Interests, Holders of Claims, current or former employees of the Debtors, or any other Entity.

1.74    "Petition Date" shall mean November 7, 2022, the date on which the Debtors commenced their Chapter 11 Cases in the Bankruptcy Court.

1.75    "Plan" shall mean this joint plan under chapter 11 of the Bankruptcy Code, together with any amendments or modifications hereto as the Debtors may file hereafter in accordance with the terms of this Plan.

1.76    "Plan Administrator" shall mean the Person or Entity, or any successor thereto, designated by the Debtors, who will be disclosed at or prior to the Confirmation Hearing, to have all powers and authorities set forth in Section 7.4 hereof.

1.77    "Plan Documents" shall mean the documents, including this Combined Disclosure Statement and Plan, to be executed, delivered, assumed, and/or performed in connection with the consummation of this Plan, including, without limitation, the documents to be included in the Plan Supplement, and any and all exhibits to the Plan and the Disclosure Statement.

1.78    "Plan Supplement" shall mean the supplemental appendix to this Plan, filed with the Bankruptcy Court not less than seven (7) calendar days prior to the Voting Deadline, which contains, among other things, draft forms or signed copies, as the case may be, of the Schedule of Retained Causes of Action, the Wind-Down Budget, and any other schedules, lists, or documents that supplement or clarify aspects of this Plan and are identified as part of the Plan Supplement.

1.79    "Post Effective Date Reserve" shall mean any reserve established by the Plan Administrator in accordance with Section 7.4 hereof and funded from Cash available in the Estates on the Effective Date.  For the avoidance of doubt, the Post Effective Date Reserve shall include the Wind-Down Amount.

1.80    "Prepetition Lenders" shall mean SVB and SVB Capital.

1.81    "Prepetition Lender Claim" shall mean the SVB Claim and SVB Capital Claim.

1.82    "Prepetition Lender Credit Documents" shall mean the SVB Credit Documents and SVB Capital Credit Documents.

1.83    "Prepetition Lender Deficiency Claim" shall mean any portion of the Prepetition Lender Claim constituting a general unsecured claim under section 506(a) of the Bankruptcy Code.

1.84    "Prepetition Lender Distribution" shall mean, subject in all respects to the terms of the Prepetition Lender Credit Documents, including the applicable subordination agreement, (a) surplus Cash (if any) available in the Estates after funding the Reserves and the GUC Recovery; and (b) the net Cash proceeds from monetizing the Residual Assets in which the Prepetition Lenders' interests are secured by a first priority Lien that is valid, perfected, and enforceable pursuant to applicable law or by reason of Bankruptcy Court order, including the Cash Collateral Orders.

1.85    "Priority Tax Claim" shall mean any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.86    "Pro Rata" shall mean the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

1.87    "Professional" shall mean any professional Person or Entity employed in these Chapter 11 Cases by Court order pursuant to Bankruptcy Code sections 327, 328, 363, or 1103 or otherwise.

1.88    "Professional Fee Claim" shall mean a Claim for compensation or reimbursement of expenses of a Professional pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code in connection with these chapter 11 cases.

1.89    "Professional Fee Claims Estimate" shall mean (i) with respect to each Professional, the Professional's good faith estimate of the amount of such Professional's accrued unpaid Professional Fee Claims through the Effective Date, to be provided by each Professional in writing to the Debtors, not less than five days prior to the Effective Date, and (ii) with respect to all of the Professionals, collectively, the sum of all individual Professional Fee Claims Estimates.

10

1.90    "Professional Fee Escrow Account" shall mean an escrow account to hold an amount of Cash equal to the Professional Fee Claims Estimate funded by the Debtors as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date solely for the purpose of paying all remaining Allowed Professional Fee Claims.  For the avoidance of doubt, the Professional Fee Escrow Account may be that certain escrow account established and funded pursuant to the Cash Collateral Orders for the purpose of paying Bankruptcy Court-approved professional fees.

1.91    "Purchase Agreement" means that certain Asset Purchase Agreement, by and among the Debtors and the Purchaser, dated as of December 8, 2022 [Docket No. 204, Exhibit 1], as may be amended, supplemented, or otherwise modified from time to time.

1.92    "Purchaser" shall mean SyBridge Digital Solutions LLC in respect of the transactions set forth in the Purchase Agreement and Sale Order.

1.93    "Rassey Declaration" shall mean the *Declaration of Louis Rassey, Co-Founder and CEO of Fast Radius, Inc., in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 14].

1.94    "Rejection Damages Bar Date" shall have the meaning ascribed to it in Section 4.3(e)iii(3) herein.

1.95    "Related Parties" shall mean, with respect to any Person or Entity, (w) such Person's or Entity's current and former direct or indirect subsidiaries, affiliates, parents, predecessors, successors, and assigns, (x) with respect to each of the foregoing in clause (w), their current and former directors, managers, officers, limited partners, general partners, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, (y) with respect to each of the foregoing in clause (w) and (x), each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, designees, trustees, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals or representatives, and any other fiduciaries to such Person or Entity with any involvement related to the Debtors; and (z) with respect to each of the foregoing in clauses (w) through (y), such Person's or Entity's respective heirs, executors, estates, servants, and nominees.

1.96    "Released Claims" shall mean any and all claims or causes of action, against the Released Parties, relating to any pre- or post-Petition Date acts or omissions, whether known or unknown, pertaining to the business activities and operations of the Debtors, the debts, liabilities, obligations and assets of the Debtors, the ownership, management, direction, or control of the Debtors, the Sale, the Plan, or any transactions or communications among the Released Parties with respect to any of the foregoing.

1.97    "Released Parties" shall mean collectively, and in each case in its capacity as such:  (a) the Plan Administrator; (b) the Committee and each of its members; (c) all Holders of Claims or Interests that (i) vote to accept the Plan, or (ii) abstain from voting on the Plan and do not affirmatively opt out of the releases provided under, or object to, the Plan; and (d) with

11

respect to each of the Debtors, the Wind-Down Debtors, and each of the foregoing Entities in clauses (a) through (c), the Related Parties of such Entities; *provided*, that any Holder of a Claim or Interest that opts out of the releases or objects to the Plan shall not be a "Released Party".

1.98    "Releasing Parties" shall mean collectively, and in each in case in its capacity as such:  (a) the Debtors; (b) the Committee and each of its members; (c) each Holder of a Claim or Interest that (x) votes to accept or are deemed to accept the Plan, or (y) either (I) abstains from voting on the Plan or (II) votes to reject the Plan and, in the case of either (I) or (II), does not opt out of the voluntary release contained in Section 8.4 hereof by checking the opt out box on the ballot, and returning it in accordance with the instructions set forth thereon, indicating that they opt not to grant the releases provided in the Plan; and (d) the Related Parties of the foregoing but only to the extent such Related Party would be obligated to release under principles of agency if it were so directed by the applicable Person or Entity in clauses (a) through (c).

1.99    "Reserves" shall mean, collectively, the Post Effective Date Reserve and the Professional Fee Escrow Account.

1.100    "Residual Assets" shall mean all property of the Estates that has not been sold, transferred, assigned, or disposed of as of the Effective Date (including after giving effect to the Sale Transaction); *provided*, *however*, that Residual Assets shall not include the Cash necessary to establish Reserves or make Distributions to Holders of Allowed Administrative Claims, Allowed Priority Claims, or Allowed Other Priority Claims in accordance with the terms of this Plan.  For the avoidance of doubt and in each case with respect to the Purchase Agreement, each of (a) the Debtors' rights to payments from the Purchaser, and (b) the "Excluded Assets," including the printers and other equipment, under the Purchase Agreement, shall be deemed Residual Assets, unless they are otherwise sold or collected prior to the Effective Date.

1.101    "Retained Actions" shall mean the Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, a schedule of which may be set forth in the Plan Supplement, as may be amended, modified, or supplemented from time to time; *provided*, that, for the avoidance of doubt, Retained Actions shall not include any Causes of Action that are or were settled, released, waived, exculpated, or transferred (a) prior to the Petition Date by any of the Debtors, or (b) pursuant to the Plan, the Purchase Agreement, or any Order of the Bankruptcy Court entered in these chapter 11 cases, as the same may be amended, modified, or supplemented from time to time.

1.102    "Sale Transaction" shall mean, collectively, those certain transactions between the Debtors and the Purchaser(s) in connection with the Purchase Agreement(s) and/or the Sale Order(s).

1.103    "Sale Order" shall mean that certain *Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (II) Approving the Asset Purchase Agreement, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 204], as may be amended, supplemented, or otherwise modified from time to time.

12

1.104 "Schedules" shall mean the schedules of assets and liabilities, schedules of Executory Contracts or Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

1.105 "Section 510(b) Claim" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.

1.106 "Secured" shall mean when referring to a Claim: (a) secured by a Lien on which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined by section 506(a) of the Bankruptcy Code, or (b) Allowed pursuant to this Plan as a Secured Claim(subject to the Confirmation Order becoming a Final Order).

1.107 "Secured Tax Claim" shall mean any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under Bankruptcy Code section 507(a)(8) (determined irrespective of time limitations), including any related Secured Claim for penalties.

1.108 "SPAC" shall mean a special purpose acquisition company.

1.109 "SVB" shall mean Silicon Valley Bank.

1.110 "SVB Capital" shall mean SVB Innovation Credit Fund VIII, L.P.

1.111 "SVB Capital Claim" shall mean any Claim of SVB Capital arising under, derived from, secured by, or based on the SVB Capital Credit Documents or the Interim Cash Collateral Order. For the avoidance of doubt, the SVB Capital Claim shall include contingent, unliquidated indemnification obligations.

1.112 "SVB Claim" shall mean any Claim of SVB arising under, derived from, secured by, or based on the SVB Credit Documents or the Interim Cash Collateral Order. For the avoidance of doubt, the SVB Claim shall include contingent, unliquidated indemnification obligations.

1.113 "SVB Credit Documents" shall mean the SVB Loan Agreement and all other agreements, documents, and instruments related thereto, including any pledge and collateral agreements, subordination agreements, intercreditor agreements, and other security agreements.

1.114 "SVB Capital Credit Documents" shall mean the SVB Capital Loan Agreement and all other agreements, documents, and instruments related thereto, including any pledge and collateral agreements, subordination agreements, intercreditor agreements, and other security agreements.

1.115 "SVB Loan Agreement" shall mean that certain Loan and Security Agreement dated as of December 29, 2020 (as amended by the First Amendment to Loan and

Security Agreement dated as of March 12, 2021, the Second Amendment to Loan and Security Agreement dated as of September 10, 2021, and the Third Amendment to Loan and Security Agreement dated as of October 31, 2022).

1.116   "SVB Capital Loan Agreement" shall mean that certain Loan and Security Agreement dated as of September 10, 2021 (as amended by the Consent and First Amendment to Loan and Security Agreement dated as of February 4, 2022, by the Second Amendment to Loan and Security Agreement dated as of March 4, 2022, and the Third Amendment to Loan and Security Agreement dated as of October 31, 2022).

1.117   "Unclaimed Distributions" shall mean any Cash or other distributable property unclaimed on or after the Effective Date or the date on which an additional Distribution would have been made in respect of an Allowed Claim.  Unclaimed Distributions shall include (a) checks (and the funds represented thereby) mailed to a Distribution Address and returned as undeliverable without a proper forwarding address, (b) funds for checks that have not been cashed within ninety (90) days of the mailing of the Distribution upon which time the Plan Administrator may issue a stop payment, (c) checks (and the funds represented thereby) not mailed or delivered because no Distribution Address to mail or deliver such property was available, and (d) any Distribution deemed to be an Unclaimed Distribution pursuant to Section 10.5 hereof.

1.118   "Unimpaired" shall mean, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.119   "U.S. Trustee" shall mean the Office of the United States Trustee for Region 3.

1.120   "U.S. Trustee Fees" shall mean fees payable pursuant to 28 U.S.C. § 1930, to the extent applicable to these Chapter 11 Cases.

1.121   "Voting Deadline" shall mean [•] at 4:00 p.m. (prevailing Eastern Time), the date specified in the Disclosure Statement, the Ballots, the Interim Approval and Procedures Order, and/or any related solicitation documents approved by the Bankruptcy Court through the Interim Approval and Procedures Order as the last date for Holders of Claims entitled to vote on this Plan to submit their Ballots with respect to this Plan, as such date may be extended by the Debtors.

1.122   "Warrants" shall mean the delisted warrants that traded on the Nasdaq Capital Market under the symbol "FSRDW."

1.123   "Whittman Declaration" shall mean *Declaration of Brian Whittman in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 15].

1.124   "Wind Down" means the wind down and dissolution of the Debtors and final administration of the Estates following the Effective Date as set forth in Article VII hereof.

1.125   "Wind-Down Budget" means that certain budget governing the fees, expenses, and disbursements to be included in the Plan Supplement.

14

1.126   "Wind-Down Debtor" shall mean Debtor Fast Radius Operations, Inc., on or after the Effective Date.

1.127   "Wind-Down Funds" shall mean Cash in an amount of $[•] to be used in accordance with the Wind-Down Budget for the sole purpose of the Wind Down.

### 1.128   Rules of Interpretation

1.129   Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein, unless the context requires otherwise. The words "include" and "including" shall mean "include, without limitation," or "including," as the case may be.  Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.130   Any reference in this Plan to a contract, instrument, release, indenture, or other agreement or documents being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, and any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented.  Subject to the provisions of any contract, certificates or articles of incorporation, by-laws, instruments, release, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules.

1.131   Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Wind-Down Debtor shall mean the Debtors and the Wind-Down Debtor, as applicable and to the extent the context requires.

1.132   The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Any reference to any Entity as a holder of a Claim or Interest includes that Entity's successors and assigns.

### 1.133   Rules of Construction.

(a)      **Undefined Terms**.  Any term used herein that is not defined herein shall have the meaning ascribed to any such term used in the Bankruptcy Code and/or the Bankruptcy Rules, if used therein.

(b)      **Miscellaneous Rules**.  This Combined Disclosure Statement and Plan is subject to the following miscellaneous rules: (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, unless superseded herein or in the Confirmation Order; (ii) any reference in this Plan to an existing document or Exhibit means such document or Exhibit as it may have been amended, restated, modified or supplemented as of the Effective Date; (iii) in

15

computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; and (iv) whenever this Plan provides that a payment or Distribution shall occur "on" any date, it shall mean "on, or as soon as reasonably practicable after," such date.

1.128    **Appendices and Plan Documents.** All Plan Documents and appendices to the Plan are incorporated into the Plan by reference and are a part of the Plan as if set forth in full herein. The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. Holders of Claims and Interests may inspect a copy of the Plan Documents, once filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or free of charge at https://cases.stretto.com/fastradius/.

1.129    **Nonconsolidated Plan**. Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

**ARTICLE II**
**TREATMENT OF UNCLASSIFIED CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

2.1    **Administrative Claims and Priority Tax Claims**. Except with respect to Administrative Claims that are Professional Fee Claims, Claims for U.S. Trustee Fees, or subject to section 503(b)(1)(D) of the Bankruptcy Code, Holders of Administrative Claims must file with the Claims Agent and serve on the Wind-Down Debtor requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, so as to be actually received on or before the Administrative Claim Bar Date.

To the extent not already paid or assumed by the Purchaser as of the Effective Date and unless otherwise agreed to by the Holder of an Allowed Administrative Claim or Allowed Priority Tax Claim, each Holder of an Allowed Administrative Claim or Allowed Priority Tax Claim will receive (as applicable) payment in full, as soon as practicable after (i) the Effective Date but in no event later than 30 days after the Administrative Claim Bar Date, or (ii) the date such Administrative Claim or Priority Tax Claim becomes an Allowed Claim by Final Order of the Bankruptcy Court, to be paid in cash or pursuant to such other treatment as may be agreed upon by the Holder of such Claim and the Debtors or the Wind-Down Debtor, as applicable.

Any Person or Entity who is required to timely file such Claim but fails to do so shall not be treated as a creditor with respect to such Claim for the purpose of Distribution purposes in these Chapter 11 Cases on account of such Claim. The notice of the Effective Date of the Plan that will be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Administrative Claim Bar Date and shall constitute notice of such Administrative Claim Bar Date.

With respect to U.S. Trustee Fees, all U.S. Trustee Fees that come due and owing on or before the Effective Date shall be paid by the Debtors on or before the Effective Date. From

16

and after the Effective Date, the Wind-Down Debtor shall pay the fees assessed against the Debtors' Estates until such time as a particular Debtor's Chapter 11 Case is closed, dismissed, or converted. Notwithstanding anything to the contrary in this Plan, the U.S. Trustee shall not be required to file a proof of claim for administrative expenses.

2.2 **Professional Fee Claims**. All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed and served within 30 days of the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders.

The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates or the Debtors or Wind-Down Debtors.

Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account or Cash in the other Reserves, as applicable, as and when such Claims are Allowed by entry of an order of the Bankruptcy Court. When all Allowed Professional Fee Claims have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be transferred to the Post Effective Date Reserve for all purposes hereunder. Notwithstanding the foregoing, the Holder of an Allowed Professional Fee Claim may receive such other, less favorable treatment as may be agreed upon by such Holder and the Debtors.

From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtor, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**ARTICLE III**
**CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES**

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

3.1 **General Rules of Classification**. The Plan groups the Debtors together solely for the purposes of describing treatment under the Plan. As noted herein, notwithstanding such groupings, the Plan constitutes a separate chapter 11 plan for each Debtor. For brevity and

convenience, the classification and treatment of Claims and Interests have been arranged into one chart. Such classification shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the claims reconciliation process. Actual recoveries may vary widely within these ranges, and without any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by Creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the Combined Disclosure Statement and Plan, the Debtors emphasize that they make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

All Claims and Interests except Administrative Claims and Priority Tax Claims are placed in the Classes set forth below. The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation, and Distribution under the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

| Class | Status / Voting | Projected Amount of Claims / Interests | Projected Recovery |
|---|---|---|---|
| **Class 1:** Other Secured Claims | Unimpaired<br><br>Not entitled to vote<br><br>Deemed to accept Plan | Up to approx. $[0.5] million | 100% |

18

| Class | Status / Voting | Projected Amount of Claims / Interests | Projected Recovery |
|---|---|---|---|
| **Class 2**: Other Priority Claims | Unimpaired<br><br>Not entitled to vote<br><br>Deemed to accept Plan | Up to approx. $[●] // [De Minimis] | 100% |
| **Class 3A**: SVB Secured Claims | Impaired<br><br>Entitled to vote | Approx. $[7.8] million | Agreed Treatment |
| **Class 3B**: SVB Capital Secured Claims | Impaired<br><br>Entitled to vote | Approx. $[●] million | Agreed Treatment |
| **Class 4**: General Unsecured Claims | Impaired<br><br>Entitled to vote | Approx. $[●] - $[●] million[2] | Less than 1% - [●]% |
| **Class 5**: Intercompany Claims & Interests | Unimpaired / Impaired<br><br>Not entitled to vote<br><br>Presumed to accept / deemed to reject Plan | N/A | N/A |
| **Class 6A**: Fast Radius Interests | Impaired<br><br>Deemed to reject<br><br>Not entitled to vote | 75,901,646 shares | 0% |
| **Class 6B**: Section 510(b) Claims | Impaired<br><br>Deemed to reject<br><br>Not entitled to vote | $0 | 0% |

---

[2] For the avoidance of doubt, the projected General Unsecured Claims pool is inclusive of (i) approximately $[•] million on account of SVB Capital's deficiency Claim, and (ii) $[2.0] million on account of the Palantir Settlement described herein.

3.2     **Unimpaired Class of Claims**.

**Class 1**:  **Other Secured Claims**.

(a)     **Classification, Impairment, and Voting**

Class 1 shall consist of Other Secured Claims against the Debtors.  Allowed Class 1 Claims are Unimpaired by the Plan and are therefore deemed to accept the Plan and not entitled to vote on the Plan.

(b)     **Treatment**

Except to the extent that a Holder of an Allowed Other Secured Claim and the applicable Debtor prior to the Effective Date, or after the Effective Date, such Holder and the Wind-Down Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release, and in exchange for such Allowed Other Secured Claim, each such Holder shall receive at the applicable Debtor's, or the Wind-Down Debtor's, discretion:

(i) payment in full in Cash of the unpaid portion of such Holder's Allowed Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, payment shall be made in accordance with its terms in the ordinary course);

(ii) the applicable Debtor's interest in the collateral securing such Holder's Allowed Other Secured Claim; or

(iii) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired in accordance with section 1124(1) or (2) of the Bankruptcy Code.

**Class 2**:  **Other Priority Claims**.

(a)     **Classification, Impairment, and Voting**

Class 2 shall consist of Other Priority Claims against the Debtors.  Allowed Class 2 Claims are Unimpaired by the Plan and are therefore deemed to accept the Plan and not entitled to vote on the Plan.

(b)     **Treatment**

Except to the extent that a Holder of an Other Priority Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the later of the Effective Date, the date such Other Priority Claim becomes an Allowed Other Priority Claim, or such other date(s) permitted under section 1129(a)(9) of the Bankruptcy Code, each Holder of an

EAST\198340363.11

Allowed Other Priority Claim shall receive one or more Distributions in Cash in an aggregate amount equal to such Allowed Other Priority Claim.

3.3    **Impaired Classes of Claims & Interests**.

**Class 3: Prepetition Lender Secured Claims**.

**Class 3A:  SVB Secured Claims**

(a)    **Classification, Impairment, and Voting**

Class 3A shall consist of the SVB Secured Claims.  The Class 3A Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

(b)    **Treatment**

Except to the extent that a Holder of a SVB Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the later of the Effective Date or the date such SVB Secured Claim becomes an Allowed Claim, subject in all respects to the Prepetition Lender Credit Documents, including the applicable subordination agreement, each Holder of a SVB Secured Claim shall receive, in full and final satisfaction, settlement, compromise, and release of, and in exchange for, each such Allowed Claim:

> (i) its distributions under the Sale Order;

> (ii) its Pro Rata share of the Prepetition Lender Distribution; and

> (iii) if such Holder votes to accept the Plan, such Holder shall be deemed a Released Party for all purposes hereunder.

**Class 3B:  SVB Capital Secured Claims**

(a)    **Classification, Impairment, and Voting**

Class 3B shall consist of the SVB Capital Secured Claims.  The Class 3B Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

(b)    **Treatment**

Except to the extent that a Holder of a SVB Capital Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the later of the Effective Date or the date such SVB Capital Secured Claim becomes an Allowed Claim, subject in all respects to the Prepetition Lender Credit Documents, including the applicable subordination agreement, each Holder of a SVB Capital Secured Claim shall receive, in full and final satisfaction, settlement, compromise, and release of, and in exchange for, each such Allowed Claim:

> (i) its distributions under the Sale Order;

> (ii) its Pro Rata share of the Prepetition Lender Distribution; and

(iii) if such Holder votes to accept the Plan, such Holder shall be deemed a Released Party for all purposes hereunder.

**Class 4: General Unsecured Claims.**

(a)    **Classification, Impairment, and Voting**

Class 4 shall consist of all General Unsecured Claims against the Debtors. Class 4 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

(b)    **Treatment**

Except to the extent that a Holder of a General Unsecured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the later of the Effective Date or the date such General Unsecured Claim becomes an Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, and release, and in exchange for, such General Unsecured Claim,

(i) its Pro Rata share of the GUC Recovery; and

(ii) if such Holder votes to accept the Plan, such Holder shall be deemed a Released Party for all purposes hereunder.

**Class 5**:  **Intercompany Claims & Intercompany Interests**.  Class 5 shall consist of all Intercompany Claims and Intercompany Interests.  Each Allowed Intercompany Claim or Intercompany Interest, unless otherwise provided for under the Plan, will either be Reinstated or cancelled and released at the option of the Debtors.

**Class 6**.

**Class 6A**:  **Interests in Debtor Fast Radius, Inc.**

(a)    **Classification, Impairment, and Voting**

Class 6A shall consist of all Interests in Debtor Fast Radius, Inc.  Because Holders of such Class 6A Interests will not receive any Distribution under the Plan, Holders of Class 6A Interests are deemed to reject the Plan and, therefore, not entitled to vote on the Plan.

22

(b)      **Treatment**

On the Effective Date, Interests in Debtor Fast Radius, Inc. shall be canceled, released, and expunged without any Distribution on account of such Interests, and such Interests will be of no further force or effect.

**Class 6B**:  **Section 510(b) Claims**.

(c)      **Classification, Impairment, and Voting**

Class 6B shall consist of all Section 510(b) Claims.  Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.  The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Claim exists.

Because Holders of such Class 6B Section 510(b) Claims will not receive any Distribution under the Plan, Holders of Class 6B Section 510(b) Claims are deemed to reject the Plan and, therefore, not entitled to vote on the Plan.

(d)      **Treatment**

On the Effective Date, Section 510(b) Claims shall be canceled, released, and expunged without any Distribution on account of such Section 510(b) Claims, and such Claims will be of no further force or effect.


**ARTICLE IV**
**BACKGROUND AND DISCLOSURES**

4.1      **General Background**.[3]

(a)      *Corporate Background*.

Originally founded in 2017, Fast Radius is headquartered in Chicago with offices in Atlanta, Louisville, and Singapore and microfactories in Chicago and at the United Parcel Service Worldport facility in Louisville, Kentucky.  Fast Radius has approximately 180 full-time employees and work with companies across industries and throughout the product design and manufacturing lifecycle.

Fast Radius built its own Cloud Manufacturing Platform, which includes a physical infrastructure—Fast Radius microfactories and third-party supplier factories—and a proprietary

---

[3]    Further information regarding the Debtors' business, assets, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in detail in the First Day Declarations, which are incorporated by reference herein.  Information about the Debtors' business was as of the Petition Date and prior to the Sale Transaction.

digital infrastructure consisting of a learning engine, operating system, and a software and manufacturing solutions platform.



Fast Radius's Cloud Manufacturing Platform supports engineers, product developers, and supply chain professionals across the three critical stages of product design and manufacturing (Design, Make, and Move):

1. **Design**:  Via an online experience, the platform provides engineers with real-time design insights and feedback across a range of manufacturing technologies and materials to help engineers optimize designs, improve yields, and select the right approach to manufacture their parts.  Engineers also have the ability to compare technologies and materials.

2. **Make**:  When customers are ready to order parts, the platform provides a modern software-driven user experience to facilitate the ordering and procurement process for industrial-grade parts.  Users also have access to a set of features that shows exactly where their part is in the production process, enhancing visibility into production and order status.

3. **Move**:  The platform allows manufacturers to store part designs in Fast Radius's virtual warehouse and eliminates the need for expensive and wasteful physical storage.  Customers can then use the platform to reorder their goods as needed.

Fast Radius offers a wide range of manufacturing technologies including additive manufacturing (often referred to as 3D Printing), Computer Numerically Controlled ("CNC") machining, injection molding, sheet metal, urethane casting, and other manufacturing methods.

   

Fast Radius has three microfactories leveraging the following manufacturing technologies: (1) Carbon DLS,[4] (2) HP Multi-Jet Fusion,[5] and (3) Stratasys FDM.[6] Fast Radius's Chicago location was recognized in 2018 by the World Economic Forum as one of the nine most advanced factories in the world embracing the tools of Industry 4.0. In addition to its full microfactories, Fast Radius has a suite of other technologies that it offers for small scale application and development. Fast Radius also utilizes a network of third-party suppliers to produce parts on behalf of customers. These suppliers are curated and vetted for quality and key capabilities. For the parts sales revenues, seventy-five percent comes from products that are

---

[4]    Carbon DLS™ is a resin-based polymer process that uses light and heat to create parts with isotropic properties, complex geometries, and excellent surface finishes. DLS offers a wide range of production-grade materials, allowing engineers to build end-use parts right off the printer. Fast Radius' Chicago factory is the largest public install-base of Carbon technology in North America.

[5]    HP MJF 3D printing is a powder bed fusion process that creates strong parts with high dimensional accuracy. Because MJF doesn't require support structures, the process allows more design freedom than many other 3D printing processes.

[6]    Fused Deposition Modeling (or FDM), also known as Fused Filament Fabrication (FFF), is the most common type of 3D printing. FDM has short lead times, a relatively low cost per part, and can produce larger parts than many other additive polymer technologies.

sourced to third-parties for manufacturing, while the other twenty-five percent comes from manufacturing done internally at the Company.



In addition to revenue from selling parts, Fast Radius is in the midst of commercializing standalone software tools. These include Software-as-a-Service (SaaS) and Data-as-a-Service (DaaS) offerings which are intended to start being sold in 2023. Some of these tools have been in development for years, and the Company is now offering the tools in market as a free version with over 23,000 sign-ups to date.

(b)     *The de-SPAC Transaction and the Debtors' Formation*

Fast Radius, in its current structure, was formed through a "de-SPAC" transaction consummated in February 2022.

i.     *De-SPAC's Generally*

In a typical de-SPAC transaction, a newly formed SPAC raises funds through an initial public offering ("IPO"). The SPAC then searches for a target company to acquire using the funds raised through the IPO and, potentially, other sources. The target company is not known when the SPAC is formed or goes public, but SPACs typically focus on acquisitions in specific industries. Stockholder approval is required prior to consummating an acquisition. The business combination of the SPAC and the target is referred to as a "de-SPAC" transaction.

Funds raised as part of the SPAC IPO are held in a trust account and stockholders retain the right to redeem their shares for a full return of their initial investment prior to the SPAC closing on an acquisition. If a stockholder does not redeem its shares, the shares are converted to equity in the surviving entity following the business combination. Accordingly, the amount of funds a post-acquisition company will have depends directly on the number of shares that are redeemed.

*ii.*        *Fast Radius Goes Public*

On July 18, 2021, ECP Environmental Growth Opportunities Corp ("ENNV"), a SPAC, entered into that certain merger agreement with ENNV Merger Sub, Inc. ("Merger Sub") and Fast Radius Operations, pursuant to which Merger Sub agreed to merge with and into Fast Radius Operations, with Fast Radius Operations surviving the merger as a wholly owned subsidiary of ENNV (the "Merger" and the "Merger Agreement", as applicable).  This transaction was publicly announced on July 19, 2021.

ENNV was a SPAC formed as a Delaware corporation on October 29, 2020, for the purpose of effecting a transaction with one or more businesses.  ENNV was a "blank check" company focused on acquiring a business located in North America concentrated on combatting climate change and improving the overall sustainability of the economy.  Through its IPO, ENNV raised approximately $345 million, which was held in trust pending identification and acquisition of a target.  In July 2021, Fast Radius was identified.

In connection with the execution of the Merger Agreement, ENNV and Legacy Fast Radius also raised (i) $75 million through a private investment in public equity ("PIPE"), through which subscribers agreed to acquire an aggregate of 7,500,000 shares of post-Merger common stock for a purchase price of $10.00 per share and (ii) $25 million through a forward purchase agreement with Goldman Sachs Asset Management, L.P., in its capacity as investment adviser on behalf of its clients ("GSAM"), under which GSAM agreed to acquire 2,500,000 shares of post-Merger common stock either in the open market in advance of the Merger or at the closing of the Merger for a purchase price of $10.00 per share.

At the closing of the Merger, ENNV was renamed "Fast Radius, Inc."  The Business Combination was completed on February 4, 2022.  The PIPE investment closed concurrently with consummation of the Business Combination.

(c)        *The Debtors' Prepetition Capital Structure*.

As of the Petition Date, the Debtors had approximately $23.8 million in total funded debt obligations, consisting of approximately $7.4 million in aggregate principal amount outstanding under the SVB Credit Documents and $16.5 million in aggregate principal amount outstanding under the SVB Capital Credit Documents:

| Debt Instrument | Lender | Maturity | Rate | Approximate Outstanding Amount |
|---|---|---|---|---|
| SVB Credit Documents | SVB | April 3, 2023 | First Tranche:  the greater of: (i) one percentage point (1.00%) below the Prime Rate, or (ii) two and one-quarter percent (2.25%). | $7.4 million |

| | | | Second Tranche: Prime + 4.25% | |
|---|---|---|---|---|
| SVB Capital Credit Documents | SVB Capital | April 3, 2023 | Prime + 6.0% | $16.5 million |
| | | | **Total Funded Debt** | $23.8 million |

### i.  *SVB Facility*

**SVB Loan Agreement.**  Fast Radius Operations and SVB, are parties to the SVB Loan Agreement.  The SVB Loan Agreement provides for a senior secured, two tranche term loan facility with a maximum principal availability of $10 million.  As of the Petition Date, Fast Radius Operations was liable and indebted to the SVB Lender in the approximate principal amount of $7.4 million, plus any other amounts due and payable under the "Loan Documents" as defined in the SVB Loan Agreement.

**SVB Liens**.  To secure the obligations under the SVB Loan Agreement, Fast Radius Operations granted to SVB Lender first priority perfected security interests, subject only to Permitted Liens in all Collateral (as defined in the SVB Loan Agreement).

### ii.  *SVB Capital Facility*

**SVB Capital Loan Agreement.**  Fast Radius Operations and SVB Capital are parties to the SVB Capital Loan Agreement.  Under the SVB Capital Loan Agreement, SVB Capital made two $10 million senior secured term loans.  As of the Petition Date, Fast Radius Operations was liable and indebted to SVB Capital in the approximate aggregate principal amount of $16.5 million, plus any other amounts due and payable under the Loan Documents (as defined in the SVB Capital Loan Agreement).[7]

**SVB Liens.**  To secure the obligations under the SVB Capital Loan Agreement, Fast Radius granted to SVB Capital first priority security interests in all Collateral (as defined in the SVB Capital Loan Agreement).

### iii.  *Trade Debt*

In the ordinary course of business, the Debtors incur unsecured indebtedness to various suppliers, trade vendors, utility providers, and services providers, among others.  As of the Petition Date, the Debtors' estimated outstanding trade payables was approximately $6 million.

---

[7]     The SVB Loan is subordinated to the SVB Capital Loan pursuant to an agreement dated September 10, 2019 between SVB and SVB Capital.

### iv.    *Common Stock and Warrants*

Fast Radius, Inc. is authorized to issue 350,000,000 shares of Common Stock with a par value $0.0001.  Shares of Fast Radius, Inc.'s Common Stock traded on The Nasdaq Stock Market under the symbol "FSRD."  The Common Stock was delisted following the Petition Date.

Fast Radius also issued certain Warrants that entitle the registered holder to purchase one share of Common Stock at a price of $11.50 per share.  The warrants expire on February 4, 2027, or earlier upon redemption or liquidation.  Warrants of Fast Radius, Inc. were traded on The Nasdaq Stock Market under the symbol "FSRDW."  The Warrants were delisted following the Petition Date.

### 4.2    **Events Leading to Chapter 11**.

Fast Radius faced liquidity challenges and incurred significant operating losses since its inception that frustrated its ability to invest in the growth necessary to attain profitability. Fast Radius has never been profitable. It has generated recurring losses that have resulted in accumulated deficits of $215.1 million and $123.5 million as of June 30, 2022 and December 31, 2021, respectively.

Additionally, Fast Radius anticipated a significant cash influx of approximately $300 to $450 million through the Business Combination in February 2022. However, due to the significant number of shareholder redemptions, it only raised approximately $73 million on a net basis through the Business Combination (after deducting fees and expenses), which proved insufficient to scale to profitability.

Following the de-SPAC transaction, beginning immediately in March 2022, Fast Radius undertook a process to raise incremental capital while continuing to execute on its business plan as adjusted for the lower levels of funding and increasing market headwinds.

Beginning in July 2022, Fast Radius, with the assistance of its investment banker Citi, launched an extensive marketing process to explore all potential strategic transactions, including sales and capital markets solutions. In August 2022, Fast Radius supplemented those marketing efforts with the engagement of Lincoln Partners, the Debtors' investment banker, to reach an even more diverse pool of potential partners. For more than 120 days prepetition, between Citi and Lincoln, Fast Radius contacted more than 275 strategic and financial parties, entered into more than 50 nondisclosure agreements, and held more than 20 management presentations. Potential investors and/or acquirors also had access to a virtual data room with approximately 1,000 documents—which is in addition to the commercial and financial information already publicly available via SEC filings. In July 2022 the board of directors formed a transaction committee, comprised of three experienced independent directors, to oversee the marketing and sale process. This process yielded a variety of proposals, including a financing transaction and other licensing arrangements—neither of which proved actionable or sufficient on a standalone basis to adequately capitalize the Company.

On October 7, 2022, following several in-person diligence meetings, a strategic buyer submitted an indication of interest to acquire the Company.  On October 19, 2022, the Company entered into an exclusivity agreement with that strategic party in furtherance of a cash-

for-equity transaction that would have merged Fast Radius into another public company, delivered a return for existing equity, unimpaired existing creditors, and obviated the need for a bankruptcy filing. To help bridge the Company to a closing of such transaction, on October 31, 2022, the Prepetition Lenders agreed to defer the payment of scheduled principal payments on November 1 and December 1—approximately $5.2 million in the aggregate—subject to certain milestones and other conditions. Notwithstanding such deal momentum, and due, in part, to exogenous factors such as an unsolicited takeover bid of our potential acquiror, on November 2, 2022, the strategic party first indicated that it was not likely in a position to move forward with the transaction. On November 6, 2022, the potential purchaser formally withdrew its offer, resulting in the termination of the exclusivity arrangement.

Termination of the exclusivity arrangement also gives rise to certain events of default under the Prepetition Loan Agreements. Although the Company actively explored alternative transactions in the several days following the strategic party's initial indications on November 2, 2022, those efforts did not yield an actionable transaction in enough time to consummate a deal within our liquidity parameters or avoid triggering an event of default under such credit documents.

### 4.3    **The Chapter 11 Cases**.

(a)     *Generally*.

As set forth above, on the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The commencement of a chapter 11 case creates an estate that is composed of all of the legal and equitable interests of the debtor as of that date. The Bankruptcy Code provides that a debtor is authorized to continue to operate its business and remain in possession of its property as a "debtor in possession." From the Petition Date, the Debtors have continued to operate their business and manage their properties as debtors and debtors in possession. By order entered November 9, 2022 [D.I. 46], the Chapter 11 Cases are being jointly administered for procedural purposes only. No trustee or examiner has been appointed in the Chapter 11 Cases. On November 18, 2022, the U.S. Trustee appointed the Committee in the Chapter 11 Cases.

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of Liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors. With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay remains in effect from the Petition Date until the Effective Date of the Plan.

(b)     *"First Day" Motions and Related Applications*.

On the Petition Date, the Debtors filed a number of "first day" motions and applications designed to ease the Debtors' transition into chapter 11, maximize the value of the Debtors' assets, and minimize the effects of the commencement of the Chapter 11 Cases. On

November 9, 2022, the Bankruptcy Court entered orders providing various forms of first-day relief, including interim or final orders approving:

- *Motion of the Debtors for Entry of an Order (I) Granting Joint Administration of their Chapter 11 Cases, and (II) Granting Related Relief*

- *Motion of the Debtors for Entry of an Order Authorizing the Debtors to (I) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) File a Consolidated List of the Debtors' Twenty Largest Unsecured Creditors, (III) Redact or Withhold Publication of Certain Personal Identification Information (IV) Limiting Certain Equity Security Holdings Disclosures, and (V) Granting Related Relief*

- *Application of Debtors for Entry of an Order (I) Approving the Retention and Appointment of Stretto, Inc. as the Claims and Noticing Agent to the Debtors, Effective to the Petition Date, and (II) Granting Related Relief*

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Their Insurance and Surety Coverage Entered Into Prepetition and Pay Related Prepetition Obligations, and (B) Renew, Supplement, Modify, or Purchase Insurance and Surety Coverage, and (II) Granting Related Relief*

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief*

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief*

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Lien Claimants, (B) Certain Vendors Entitled to Administrative Expense Priority Under Section 503 (b)(9) of the Bankruptcy Code (C) Foreign Vendors, (D) Critical Vendors and Service Providers, and (II) Granting Related Relief*

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue Customer Programs and to Honor Certain Prepetition Obligations to Customers, and (II) Granting Related Relief*

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Continued Use of the Debtors' Cash Management System, and (II)*

31

*Granting Related Relief [D.I. 11]; 10. Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Wages and Compensation and Maintain and Continue Employee Benefit Programs and (II) Authorizing and Directing Banks to Honor And Process Checks And Transfers Related To Such Employee Obligations, and (III) Granting Related Relief*

- *Motion of the Debtors for Interim and Final Orders Establishing Notice and Hearing Procedures for Trading in Equity Securities in Fast Radius, Inc.*

- *Motion of the Debtors' for Entry of Interim and Final Orders (A) Authorizing the Debtors to Use Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Granting Related Relief*

(c)    *Retention of Professional Advisors.*

The Debtors have filed applications to retain and employ (a) DLA Piper LLP (US) as their bankruptcy counsel [D.I. 87], (b) Bayard, P.A. as co-counsel [D.I. 88]; (c) A&M as their financial advisor [D.I. 84], (d) Stretto, Inc. as their administrative advisor [D.I. 85], and (e) Lincoln as their investment banker [D.I. 86], all of which were approved by the Court.

(d)    *Appointment of the Committee*

On November 18, 2022, the U.S. Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* [D.I. 83]. The Committee was initially comprised of: (a) Palantir Technologies, Inc.; (b) MasterGraphics; and (c) Stratasys, Inc. On November 21, 2022, the U.S. Trustee filed an *Amended Notice of Appointment of Committee of Unsecured Creditors* reflecting that MasterGraphics was no longer a member [D.I. 90]. On December 2, 2022, the U.S. Trustee filed another *Amended Notice of Appointment of Committee of Unsecured Creditors* [D.I. 116] reconstituting the Committee as (a) Stratasys, Inc., and (b) LBA LVF VII-Company XXXIII, LLC.

To assist the Committee in carrying out its duties, the Committee has indicated it intends to seek to retain and employ (a) Potter Anderson & Corroon LLP, as counsel, and (b) Emerald Capital Advisors, as financial advisor.

(e)    *Claims Process and Bar Dates*

i.    *Schedules & Statements*

On November 28, 2022, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs [D.I. 101-106] with the Bankruptcy Court, each of which are incorporated hereto in their entirety by reference.

ii.    *Section 341(a) Meeting of Creditors*

The section 341(a) meeting of creditors was held and closed on December 7, 2022.

### iii.    Bar Date Order and Bar Dates

On November 30, 2022, the Bankruptcy Court entered the Bar Date Order and established the following Bar Dates:

(1)    <u>General Bar Date</u>: December 23, 2022 at 4:00 p.m. (ET) as the deadline for each person or Entity other than a Governmental Unit to file a Claim in respect of a prepetition Claim against any Debtor;

(2)    <u>Governmental Bar Date</u>: May 6, 2023 at 4:00 p.m. (ET) as the deadline for Governmental Units to file a Claim in respect of a prepetition Claim against any Debtor;

(3)    <u>Amended Schedules Bar Date</u>: the later of (i) the General Bar Date or the Governmental Bar Date, as applicable; and (ii) 4:00 p.m. (ET) on the date that is thirty (30) days from the date on which the Debtor provides notice of an amendment or supplement to the Schedules;

(4)    <u>Rejection Damages Bar Date</u>:  the later of (i) the General Bar Date; (ii) 30 days after the Claimant is served with notice of the applicable Bankruptcy Court order authorizing the rejection of the Executory Contract or Lease at issue; or (iii) any other date that the Court may fix in the applicable rejection order for the Rejection Damages Claims Bar Date as the deadline for the non-debtor counterparty to the applicable rejected executory contracts and leases to file proofs of Claim based on any relief set forth in the applicable rejection order.

### iv.    Committee Objection to Cash Collateral & Related Matters

On December 7, 2022, the Committee objected [D.I. 148] to the Debtors' cash collateral motion.  In its objection, the Committee contends, among other things, that there are defects as to the perfection of the Liens asserted by the Prepetition Secured Lenders in respect of their collateral.  The Committee believes that consequence of the defect is that certain accounts receivable of the Debtors may not be subject to valid, perfected, enforceable prepetition liens.  The Prepetition Secured Lenders dispute that there is any defect.  The objection remains unresolved.

### (f)    Sale of Substantially All of the Debtors' Assets to SyBridge

As further detailed in the First Day Declarations and above, the Debtors have faced diminishing liquidity since they went public in February 2022 and, in July and August of 2022, engaged investment bankers Citi and Lincoln to assist in exploring all potential strategic alternatives. The Company retained Lincoln to supplement Citi's outreach efforts and broaden the potential investor universe to include smaller, middle market financial and strategic investors, special situation / opportunistic investors, and technology-focused private equity investors. The Debtors and their investment bankers contacted over 275 potentially interested parties as part of this prepetition process, entered into more than 50 nondisclosure agreements, and held more than 20 management presentations. Potential investors and/or acquirors also had access to a virtual data room with approximately 1,000 documents—which is in addition to the commercial and financial information already publicly available via SEC filings. This process yielded a variety of proposals,

including a financing transaction and other licensing arrangements—neither of which proved actionable or sufficient on a standalone basis to adequately capitalize the Debtors.

More specifically, the Debtors were in advanced discussions with one particular strategic investor. On September 29 and 30, 2022, the Debtors and such party engaged in substantial, in-person diligence. On October 7, 2022, the strategic investor submitted an indication of interest to acquire the Debtors. On October 19, 2022, the Debtors entered into an exclusivity agreement with that party in furtherance of a cash-for-equity transaction that would have effectively taken the Company private, delivered a return for existing equity, and left existing creditors unimpaired. However, due, in part, to exogenous factors such as an unsolicited takeover bid of that potential acquiror, the deal could not move forward as contemplated by early November. This development limited the Debtors' alternatives because of their liquidity profile and truncated window within which to source an acceptable out-of-court transaction to avoid a default under the Prepetition Loan Agreements. Accordingly, the Debtors were left with limited liquidity and forced to pivot to an expedited filing for chapter 11.

As part of launching these chapter 11 cases, the Debtors requested and obtained Bankruptcy Court approval to hear the Bidding Procedures Motion on an expedited basis. Following a hearing on November 14, 2022, the Bankruptcy Court entered the Bidding Procedures Order setting the following key dates related to the Sale process:

- December 5, 2022 as the bid deadline

- December 7, 2022 as the date for an auction, if necessary

- December 9, 2022 as the sale hearing—moved to December 12, 2022

- No later than December 16, 2022 as the target closing date

During the chapter 11 cases, the Debtors, their management team, and their advisors continued work tirelessly to market the Debtors' business with the goal of identifying the optimal buyer or financial partner as part of the chapter 11 process. The Debtors' advisors actively reached out to new potential buyers while simultaneously reengaging parties who had participated in the Debtors' prepetition marketing process. During the postpetition period, the Debtors and its advisors identified and connected with a total of 303 potential buyers, 35 of which were inbound inquiries prompted from interested strategic and financial parties given the public nature of the chapter 11 announcement.

Of the potential buyers contacted, at least 81 potential buyers were granted access to an electronic data room containing documents and information concerning the Debtors' assets under appropriate confidentiality agreements. As part of the diligence process, Lincoln provided prospective investors with a streamlined (pre-recorded) virtual management presentation, software demo (pre-recorded), and access to over 1,000 files. Certain of these potential buyers conducted more in-depth diligence and, thereafter, were invited to, requested, and/or participated in in-person or management calls via zoom. Management presentations were held with 36 potential bidders. Throughout the marketing and sale process, the Debtors, their management team, and their advisors have been committed to achieving a successful sale that maximized the value of the

Debtors' assets. The Debtors' management, employees and advisors have worked around the clock to obtain the best possible result for the Debtors' stakeholders.

Prior to the start of the auction, the Debtors received eleven bids, which were submitted by: (i) SyBridge Digital Solutions LLC ("SyBridge"); (ii) TRG V, LLC ("TRG")[8]; (iii) Monomyth Sponsor Group, LLC; (iv) BigBear.ai, LLC ("BigBear"); (v) Formlabs Inc.; (vi) Immensa Technology Labs FZ-LLC; (vii) Manufacturers Capital, a division of Commercial Credit Group, Inc.; (viii) Motherson Technology Services USA Limited; (ix) TPK Universal Solutions Limited; (x) Xometry; and (xi) Diversified Plastics. The Debtors designated each bid as a Qualifying Bid with respect to the Assets it covered.

On December 7 and December 8, 2022, in accordance with the Sale Motion and the Bidding Procedures Order, the Debtors conducted the auction in person and via remote video for the sale of substantially all of their assets. Upon the conclusion of the auction, 36 hours later, SyBridge was named the Successful Bidder and BigBear and TRG were named the Backup Bidders, as set forth in the notice filed on December 8, 2022 [D.I. 167].

The Debtors estimate that the SyBridge going-concern transaction generates a total estimated value of nearly $17 million, inclusive of more than $13 million of cash, offers to approximately 75% of the Debtors' employees, the proposed assumption of more than 100 contracts and up to more than $2.4 million of liabilities, among other things.

The SyBridge transaction was proposed and entered into by the Purchaser and the Debtors in good faith, after arm's length negotiations, and without collusion. The SyBridge transaction constitutes the highest or otherwise best offer for the assets, and the Debtors' determination, in consultation with the consultation parties, that the transactions contemplated under the Purchase Agreement constitute the highest or otherwise best offer for the Debtors' assets based on a review of the components of the bid as compared to the next highest bid and discussion of those factors with both the consultation parties and the Debtors' board of directors (excluding Mr. Rassey) and based on advice the Board received from its professional advisors: Lincoln, DLA Piper LLP (US), and Alvarez & Marsal North America, LLC. The Committee and certain contract counterparties objected to the Sale Transaction, including the proposed assumption and assignment of certain contracts and leases.

On December 12, 2022, the Bankruptcy Court presided over a contested Sale Hearing, at the conclusion of which it approved the Sale Transaction and entered the Sale Order. A copy of the Purchase Agreement is attached to the Sale Order and incorporated herein by reference in its entirety.

On December 16, 2022—i.e., the Closing Date—the Debtors and the Purchaser consummated the Sale Transaction. Pursuant to, and subject to the terms of, the Sale Order, on the Closing Date, the Debtors distributed approximately $7.8 million of Cash to SVB and

---

[8]     The managing member of TRG is Lou Rassey, the Company's CEO and co-founder. TRG was separately represented during the bid process and Auction by McDermott Will & Emery, and Mr. Rassey was excluded from all of the Debtors' review and deliberation of the bids and auction strategy following his submission at the Bid Deadline and did not participate in the Debtors' qualification of bids or their determination of the highest or otherwise best bid.

approximately $2.0 million to SVB Capital while escrowing the remaining $2.0 million of Cash consideration paid by the Purchaser as part of the Sale Transaction. The Debtors also escrowed $1.5 million pursuant to the Sale Order in respect of Lincoln's potential fees.

The Plan provides for the best possible means to conclude these chapter 11 cases and make Distributions to creditors.

## ARTICLE V
## CONFIRMATION AND VOTING PROCEDURES

5.1 **Confirmation Procedure**. On January [•], 2023, the Bankruptcy Court entered the Interim Approval and Procedures Order conditionally approving the Combined Disclosure Statement and Plan for solicitation purposes only and authorizing the Debtors to solicit votes to accept or reject the Plan. The Confirmation Hearing has been scheduled for January [•], 2023 at [●] (prevailing Eastern Time) to consider (a) final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

5.2 **Procedure for Objections**. Any Objection to final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served via email on (a) counsel to the Debtors, DLA Piper LLP (US) (i) 1201 North Market Street, Suite 2100 Wilmington, Delaware 19801 (Attn: R. Craig Martin, Esq. at craig.martin@us.dlapiper.com); (ii) 1251 Avenue of the Americas New York, New York 10020 (Attn: Rachel Ehrlich Albanese, Esq. at rachel.albanese@us.dlapiper.com); and (iii) 444 West Lake Street, Suite 900 Chicago, Illinois (Attn: W. Benjamin Winger, Esq. at benjamin.winger@us.dlapiper.com); (b) proposed counsel to the Committee, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor Wilmington, Delaware 19801 (Attn: Christopher M. Samis at csamis@potteranderson.com, R. Stephen McNeill at rmcneill@potteranderson.com, and Elizabeth R. Schlecker at eschlecker@potteranderson.com); (c) counsel for Silicon Valley Bank, Morrison & Foerster LLP, 200 Clarendon St., Boston, MA 02116 (Attn.: Alexander Rheaume, Esq.) and 250 W. 55th St., New York, NY 10019 (Attn.: Benjamin Butterfield, Esq. and Miranda Russell, Esq.); (d) counsel for SVB Innovation Credit Fund VIII, L.P., Chapman and Cutler LLP, 320 South Canal Street, Chicago, Illinois 60606, David T. Audley at audley@chapman.com and Michael T. Benz at benz@chapman.com, and Klehr Harrison Harvey Branzburg LLP, 919 N. Market Street, Suite 1000, Wilmington, Delaware 19801, Richard M. Beck at rbeck@klehr.com, and (e) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Timothy Fox, Esq. at Timothy.Fox@usdoj.gov), by no later than [•], 2023, at 4:00 p.m. (prevailing Eastern Time). Unless an Objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

5.3 **Requirements for Confirmation**. The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code.

Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (b) must be feasible. The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be presumed to have accepted the Plan.

### 5.4    **Classification of Claims and Interests**.

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a holder of a Claim or Interest may challenge the classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If this occurs, the Debtors intend, in accordance with the terms of the Plan, to make such modifications to the Plan as may be necessary to permit its confirmation. Any such

reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including contractual subordination, if any) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtor reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

5.5    **Impaired Claims or Interests**.

Pursuant to section 1126 of the Bankruptcy Code, only classes of claims or interests that are Impaired under a plan may vote to accept or reject such plan. Under section 1124 of the Bankruptcy Code, a claim or interest is Impaired under a plan if the holder's legal, equitable, or

contractual rights are changed under such plan.  In addition, if the holders of claims or interests in an Impaired Class do not receive or retain any property under a plan on account of such claims or interests, such Impaired Class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, holders of Claims in Classes 3 and 4 are Impaired and are entitled to vote on the Plan.  Holders of Claims or Interests in Classes 5, 6, and 7 are Impaired and will not receive or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan and deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.  Under the Plan, holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code.

### 5.6    Confirmation without Necessary Acceptances

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.

In the event that any Impaired Class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all Impaired Classes, if the plan has been accepted by at least one Impaired Class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code requires that a court find that a plan "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting Impaired Class of claims or interests.  Here, because holders of Claims and Interests in Classes 5 and 6 are deemed to reject the Plan, the Debtors may seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  The Debtors believe that such requirements are satisfied, as no holder of a Claim or Interest junior to those in Classes will receive any property under the Plan.  In addition, the Debtors reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests.  The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class.  Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable."  In order to determine whether a plan is "fair and equitable," the Bankruptcy Code

establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

(a)     *Secured Creditors.*  Either (i) each Impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each Impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b)     *Unsecured Creditors.*  Either (i) each Impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the Plan.

(c)     *Equity Interests.*  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the Distributions provided under the Plan satisfy the absolute priority rule, where required.

### 5.7    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan).  Inasmuch as substantially all of the Debtors' assets have been liquidated and the Plan provides for the Distribution of all of the Cash proceeds of the Debtors' assets to holders of Claims that are Allowed as of the Effective Date in accordance with the Plan, for purposes of this test, the Debtors have analyzed the ability of the Wind-Down Debtor to meet its obligations under the Plan. Based on the Debtors' analysis, the Wind-Down Debtor will have sufficient assets to accomplish its tasks under the Plan.  Therefore, the Debtors believe that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

### 5.8    Best Interests Test and Liquidation Analysis

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are Impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an Impaired Class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable Distribution to holders of each Impaired Class of claims and interests if a debtor were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code.  To determine if a plan is in the best interests of each Impaired class, the present value of the Distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired classes under the plan.  If the hypothetical liquidation distribution to holders of claims or interests in any Impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such Impaired class.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan.  However, there would be additional costs, expenses, and delays that the Estates would incur as a result of liquidating the Estates in a chapter 7 case.  The Debtors believe that creditors will receive Distributions faster and in greater amounts than any chapter 7 liquidation.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee.  The Debtors believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors.  Conversion also would likely delay the liquidation process and ultimately Distribution of the Residual Assets.  The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals) that are allowed in the chapter 7 cases.  Ultimately, the Prepetition Lenders would need to consent to the use of their cash collateral to fund such a chapter 7 process, and there is no guarantee that they would do so.  Without such consent, conversion to chapter 7 would serve only to increase the amount of claims against the Debtors that would not be paid—both in terms of currently incurred and unpaid administrative and priority claims, as well as any costs incurred in administering the chapter 7 case.

Accordingly, the Debtors believe that holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

## 5.9    Releases & Exculpations

The Plan proposes to release the Released Parties and exculpate the Exculpated Parties.  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element among the Debtors and such parties in obtaining their continued support for the marketing process, Sale Transaction, and the Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to market, negotiate, and implement the

41

Sale Transaction and the Plan, which, in the case of the Sale Transaction, maximizes and preserves the going-concern value of the Debtors for all parties in interest, including employees, and further, in the case of the Plan, optimizes recoveries and provides for the best possible conclusion of these chapter 11 cases.  The proposed releases and exculpations preserve value by enabling the Debtors to emerge swiftly from chapter 11 while giving finality to stakeholders that elect such.  In addition, certain Released Parties and Exculpated Parties have agreed to make further contributions, including by agreeing to reductions in the amounts or waivers of their Claims and supporting the Wind-Down after the Closing Date while not collecting any salary or benefits from the Estates— so long as they receive the full benefit of the Plan's release and exculpation provisions.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The releases, exculpation, and injunction provisions are set forth in Article VIII hereof.

### 5.10    Acceptance of the Plan

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of Ballots are set forth in the Interim Approval and Procedures Order.

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan.  At least one Voting Class, excluding the votes of Insiders, must actually vote to accept the Plan.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, THE DEBTORS URGE YOU TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE.  Please be sure to complete the Ballot properly and legibly and to identify the exact amount of your Claim and the name of the Holder. If you are a Holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, you received a damaged Ballot, or you lost your Ballot, or if you have any questions concerning the Plan or procedures for voting on the Plan, please contact the Claims Agent via e-mail at teamfastradius@stretto.com, or by calling the toll-free information line at (877) 361-4291 or, if calling from outside the United States or Canada, at (714) 384-7055.  The Claims Agent is not permitted to provide legal advice.

### ARTICLE VI
### CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND ASSOCIATED DOCUMENTS BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS

SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### 6.1    **The Plan May Not Be Accepted**.

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in the Plan.

### 6.2    **The Plan May Not Be Confirmed**.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.  Even if the Bankruptcy Court determined that the Combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation had not been met.  Moreover, there can be no assurance that modifications to the Combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes.  If the Plan is not confirmed, it is unclear what Distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent liquidation.

### 6.3    **Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections**.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution.  There can be no assurance that the estimated Claim amounts set forth in the Plan are correct.  These estimated amounts are based on certain assumptions with respect to a variety of factors.  Both the actual amount of Allowed Claims in a particular Class and the funds available for Distribution to such Class may differ from the Debtors' estimates.  If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for Distribution to such Class are lower than the Debtors' estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

### 6.4    **Objections to Classification of Claims**.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.  To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member.  Any

43

such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member.  The Debtors believe that they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Debtors believe that the Plan complies with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.  Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

### 6.5    **Failure to Consummate the Plan**.

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court.  Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

### 6.6    **Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan**.

There can be no assurance that the estimated Claim amounts set forth in the Plan are correct, and the actual allowed amounts of Claims may differ from the estimates.  The estimated amounts are based on certain assumptions with respect to a variety of factors.  Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein, thereby materially reducing the recovery to the Holders of Class 3 Prepetition Lenders' Claims and Class 4 General Unsecured Claims under the Plan.

6.7    **Plan Releases May Not Be Approved**.

There can be no assurance that the releases, as provided in Article VIII of the Plan, will be granted.  Failure of the Bankruptcy Court to grant such relief may result in a chapter 11 plan that differs from the Plan or the Plan not being confirmed.

6.8    **Certain Tax Considerations**.

There are a number of material income tax considerations, risks and uncertainties associated with the Plan described herein.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.    ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**ARTICLE VII**
**MEANS OF IMPLEMENTING THE PLAN**

In addition to the provisions set forth elsewhere in this Plan, the following shall constitute the means of execution and implementation of this Plan.

7.1    **General**

Upon confirmation of the Plan, and in accordance with the Confirmation Order, the Debtors or the Wind-Down Debtor, as applicable, will be authorized to take all necessary or appropriate steps, and perform all necessary or appropriate acts, to consummate the terms and conditions of the Plan, including, as applicable, consummation of the Sale Transaction, the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or other corporate transactions.  Such actions may include:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (d) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

45

7.2    **Sale Transaction & Sources of Consideration for Plan Distributions**

The Wind-Down Debtor will fund distributions under the Plan with Cash held on the Effective Date by or for the benefit of the Debtors or the Wind-Down Debtor, including the remaining Sale Transaction Cash proceeds due and payable under the Purchase Agreement and Sale Order after the Closing Date, the proceeds of any non-Cash assets held by the Wind-Down Debtor, and the assumption of liabilities by the Purchaser under the Purchase Agreement and Sale Order. Notwithstanding anything to contrary herein, on the Effective Date, any Cause of Action not settled, released, enjoined, or exculpated under Article VIII hereof on or prior to the Effective Date shall vest in the Wind-Down Debtor and shall be subject to administration by the Plan Administrator. The Debtors have also offered to grant certain releases to Holders of Claims that vote to accept or do not opt of the releases, or object to, the Plan.

7.3    **Wind-Down Debtor**

On the Effective Date, Debtor Fast Radius Operations, Inc. shall continue in existence after the Effective Date as the Wind-Down Debtor for purposes of (a) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtor after the Effective Date and after the consummation of the Sale Transaction, (b) performing the Debtors' obligations under the Purchase Agreement or any transition services agreement entered into on or after the Effective Date by and between the Debtors and the Purchaser, (c) resolving any Disputed Claims, (d) paying or otherwise satisfying Allowed Claims, (e) filing appropriate tax returns, and (f) administering the Plan in an efficacious manner. The Wind-Down Debtor shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forum, or administrative proceedings outside of the Bankruptcy Court, in each case without the requirement or need for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

Upon the occurrence of the Effective Date, (i) each Debtor's board of directors shall be deemed to have resigned, and (ii) any Estate non-Cash assets remaining shall best in the Wind-Down Debtor for the purpose of administering the Estate and consummating the Plan. Such assets shall be held free and clear of all Liens, claims, and interests of Holders of Claims and Interests, except as otherwise expressly provided in this Plan. Any distributions to be made under the Plan from such assets shall be made by the Plan Administrator or its designee. The Wind-Down Debtor and the Plan Administrator shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

After the Effective Date, Debtor Fast Radius Operations, Inc. shall continue to exist as the Wind-Down Debtor for Plan Distribution purposes. As of the Effective Date, all other Debtors shall be deemed dissolved under applicable state law. At any time after the Effective Date, the Plan Administrator shall be authorized to dissolve the remaining Debtors upon filing a notice of such dissolution with the Bankruptcy Court, notwithstanding any requirements of applicable state law, without the necessity for any other or further actions to be taken by or on behalf of the remaining Debtors or payments to be made in connection therewith.

7.4    **Plan Administrator**.

(a)    **Appointment**.  The Plan Administrator shall be appointed by the Debtors. The appointment of the Plan Administrator shall be effective as of the Effective Date.  Successor Plan Administrator(s) shall be appointed in accordance with this Plan.

(b)    **Powers and Duties**.  The Plan Administrator shall act for the Wind-Down Debtor in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions hereof (and all certificates of incorporation, bylaws, shareholder agreements, and related documents are deemed amended by the Plan to permit and authorize same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall succeed to the powers of the Debtors' directors and officers.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtor.  For the avoidance of doubt, the foregoing shall not limit the authority of the Wind-Down Debtor or Plan Administrator, as applicable, to continue the employment of any former director, officer, employee, or other agent or representative.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to made distributions thereunder and Wind Down the businesses and affairs of the Debtors and the Wind-Down Debtor, as applicable, including, without limitation:

(i)    to exercise all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced and take all actions that may be or could have been taken by the Debtors with like effect as, if authorized, exercised and taken by unanimous action of the Debtors partners, members, officers, directors and shareholders; including, without limitation, amendment of the certificates of incorporation and by-laws of the Debtors, merger of any Debtor into another Debtor, the dissolution of any Debtor and the assertion or waiver of any Debtors' attorney/client privilege;

(ii)    to open and maintain bank and other deposit accounts, escrows and other accounts, calculate and implement Distributions to Holders of Allowed Claims as provided for or contemplated by the Plan and take other actions consistent with the Plan and the implementation thereof, including the establishment, re-evaluation, adjustment and maintenance of appropriate Reserves in accordance with this Plan, in the name of the Debtors or the Wind-Down Debtor, even in the event of the dissolution of the Debtors;

(iii)    to make a good faith valuation of the non-Cash assets of the Estate;

(iv)    subject to the applicable provisions of the Plan, to collect and liquidate all Residual Assets pursuant to the Plan, to make Distributions generated by the sale or disposition of Residual Assets and to administer the winding-up of the affairs of the Debtors;

(v)    to borrow funds and replenish the Reserves and to take all actions necessary to preserve and maximize the value of the Estate;

47

(vi)    to object to any Claims (Disputed or otherwise), and to defend, compromise and/or settle any Claims prior to or following objection without the necessity of approval of the Bankruptcy Court;

(vii)    to make decisions without further Bankruptcy Court approval, regarding the retention or engagement of professionals, employees and consultants by the Wind-Down Debtor or Plan Administrator, including (i) the charges incurred on or after the Effective Date for services of professionals, without application to the Bankruptcy Court, and (ii) disbursements, expenses or related support services relating to the winding down of the Debtors and implementation of the Plan, without application to the Bankruptcy Court;

(viii)    to cause, on behalf of the Debtors, the Wind-Down Debtor, and their Estates all necessary tax returns and all other appropriate or necessary documents related to municipal, State, Federal or other tax law to be prepared or filed timely, in accordance with the Plan; *provided*, that the Plan Administrator, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's chapter 11 case, as determined under applicable tax laws;

(ix)    to enter into any agreement or execute any document required by or consistent with the Plan and perform all of the obligations of the Debtors or the Wind-Down Debtor hereunder;

(x)    to abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization, any assets that the Plan Administrator determines, at the conclusion of the Case, are of no benefit to creditors of the Debtors or too impractical to distribute;

(xi)    to investigate (including pursuant to Bankruptcy Rule 2004), prosecute and/or settle any Retained Action, participate in or initiate any proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction, participate as a party or otherwise in any administrative, arbitrative or other non-judicial proceeding, litigate, or settle such Retained Actions on behalf of the Wind-Down Debtor and pursue to settlement or judgment such actions;

(xii)    to use assets of the Wind Down Debtor to purchase or create and carry all appropriate insurance policies, bonds or other means of assurance and protection of the Wind-Down Debtor and Plan Administrator and pay all insurance premiums and other costs he or she deems necessary or advisable to insure the acts and omissions of the Plan Administrator and its representatives;

(xiii)    to implement and/or enforce all provisions of this Plan and any Purchase Agreement;

(xiv)    to maintain appropriate books and records (including financial books and records) to govern the distributions hereunder;

(xv)    to pay fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and to file with the Bankruptcy Court and serve on the United States Trustee quarterly post-confirmation financial reports for each of the Debtors until such time as such reports are no longer required, or the Bankruptcy Court orders otherwise, a final decree is entered closing these Chapter 11 Cases or these Chapter 11 Cases are converted or dismissed;

(xvi)    to dissolve the Wind-Down Debtor if the Plan Administrator determines, in reasonable reliance on such professionals as it may retain, that the expense of administering the Wind-Down Debtor so as to make a final Distribution to Holders of Allowed Claims is likely to exceed the value of the remaining assets;

(xvii)    to seek one or more final decrees closing the Cases; and

(xviii)    To do all other acts or things consistent with the provisions of this Plan that the Plan Administrator deems reasonably necessary or desirable with respect to implementing the Plan.

(c)    **Compensation**.  The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement.

(d)    **Post Effective Date Reserve**.  The Plan Administrator shall be authorized to establish and fund a Post Effective Date Reserve with an amount of Cash, inclusive of the Wind-Down Amount, it deems necessary or appropriate to satisfy future costs and expenses for the implementation of the Plan and discharge of its duties hereunder.  The Post Effective Date Reserve shall be used by the Plan Administrator solely to satisfy the distributions set forth herein and the expenses of the Wind-Down Debtor and the Plan Administrator as set forth herein.  The Plan Administrator is authorized, but not directed, in accordance with its business judgment, to establish and fund one or more reserves, which shall be deemed part of the Post Effective Date Reserve, in specific amounts from the Post Effective Date Reserve as necessary or appropriate to discharge its duties and make distributions hereunder.  In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.

(e)    **Limitation of Liability; Exculpation of Plan Administrator**.  The Plan Administrator and all professionals retained by the Wind-Down Debtor or Plan Administrator, as applicable, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtor.  The Plan Administrator and any such professionals may rely upon written information previously generated by the Debtors**.**

(f)    **Successor Plan Administrator(s)**.  The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court; *provided*, that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtor and the Wind Down shall be terminated.

7.5     **Cancellation of Existing Securities and Agreements**.

Except as otherwise provided in this Plan, and in any contract, instrument or other agreement or document created in connection with this Plan, on the Effective Date, the Interests and any other promissory notes, share certificates, whether for preferred or common stock (including treasury stock), other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards, and commitments, including, without limitation, any agreements purporting to relate to deferred compensation that relate to Interests or options, shall be deemed cancelled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors under the notes, share certificates, and other agreements and instruments governing such Claims and Interests shall be released; *provided, however*, that the cancellation, release, and discharge of the foregoing shall not affect whether a timely Claim made on account of such obligation may become an Allowed Claim; *provided, further, however*, that certain instruments, documents, and credit agreement related to Claims shall continue in effect solely for the purpose of allowing the Plan Administrator to make Distributions in accordance with this Plan.  The Holders of or parties to such cancelled notes, share certificates, and other agreements and instruments shall have no rights against the Debtors, the Estates, and the Wind-Down Debtor or the Plan Administrator arising from or relating to such notes, share certificates, and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to this Plan.

7.6     **Exemption from Certain Transfer Taxes**.  Pursuant to Bankruptcy Code section 1146(a), any transfers from any of the Debtors to any other Entity pursuant to this Plan shall not be subject to any stamp tax or similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any applicable instruments or documents without the payment of any such tax or governmental assessment

7.7     **Palantir Settlement**.

The Debtors and Palantir Technologies, Inc. ("Palantir") have engaged in arms'-length, good faith, hard fought negotiations regarding a mutually acceptable resolution of various matters in these chapter 11 cases.  Among other things, Palantir has asserted Claims of not less than $9,281,250 against certain Debtors.  In exchange for the releases, exculpations, injunctions, claims reconciliation, waivers, and other consideration set forth herein, Palantir and the Debtors agree that, on the Effective Date, Palantir shall be entitled to an Allowed General Unsecured Claim against the Debtors in the amount of $2.0 million (the "Palantir Allowed Unsecured Claim") for distribution purposes.  Any recovery on account of the Palantir Allowed Unsecured Claim shall be subject to the Plan.  Additionally, the Debtors and Palantir acknowledge and agree that:

- Upon the occurrence of the Effective Date, all contracts, agreements, and other arrangements as between any of the Debtors and Palantir, including that certain Master Subscription Agreement, dated as of May 10, 2021, shall be deemed mutually terminated as of the Petition Date;

- Upon the occurrence of the Effective Date, Palantir shall waive any entitlement to a recovery on account of (i) any Claim, including Administrative Claims, and

50

claims for rejection damages under section 502(g) of the Bankruptcy Code, other than the Palantir Allowed Unsecured Claim, and (ii) any Interest in Debtor Fast Radius, Inc.;

- Palantir shall be entitled to vote the entire amount of its asserted Claims as General Unsecured Claims; and

- Palantir shall support (and not oppose) these chapter 11 cases in all respects, including with respect to Confirmation and the mutual releases set forth in Article VIII hereof.

Confirmation shall be deemed approval of the Palantir Settlement.  For the avoidance of doubt, the Debtors reserve the right to seek approval of the Palantir Settlement by separate motion pursuant to Bankruptcy Rule 9019.

7.8 **Preservation of Retained Actions**.  Unless a Retained Action against any Entity is expressly waived, relinquished, released, compromised, exculpated, or settled pursuant to this Plan or any Final Order (including the Confirmation Order, the Final Cash Collateral Order, and the Sale Order), the Debtors expressly reserve such Retained Action to be vested in the Wind-Down Debtor for possible prosecution by the Plan Administrator, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Actions upon or after the entry of the Confirmation Order or Effective Date based on the Plan or the Confirmation Order, except where such Retained Actions have been waived, relinquished, released, compromised, exculpated, or settled pursuant to the Plan or any Final Order (including the Confirmation Order and the Sale Order).  In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtor may enforce all rights to commence and pursue, as appropriate, any and all such Retained Actions, whether arising prior to or after the Petition Date, and the Wind-Down Debtor's rights to commence, prosecute, or settle any such Retained Actions shall be preserved notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date.

The failure of the Debtors to list a claim, right, cause of action, suit or proceeding shall not constitute a waiver or release by the Debtors or their Estates of such claim, right of action, suit or proceeding.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Retained Actions against them as any indication that the Wind-Down Debtor will not pursue any and all available Retained Actions against them.  The Debtors or the Wind-Down Debtor, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein, including Article VIII hereof.**

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtor.  In addition, the Wind-Down Debtor reserves the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits.  After the Effective Date, the Wind-Down Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce,

abandon, settle, compromise, release, withdraw, or litigate to judgment any Retained Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

7.9 **Sale of HP Printers**.

Without limiting the parties' respective rights and obligations with regard to the Purchase Agreement, the Sale Order, or otherwise in relation to the Sale Transaction, the Debtors and the Purchaser have further agreed to the purchase and sale of nine HP printers and related equipment that comprise "Excluded Assets" under the Purchase Agreement pursuant to the Plan. Such purchase and sale shall be "free and clear" of all Liens, claims, encumbrances, and so forth as and to the extent contemplated by the Sale Transaction under the Sale Order. More specifically, the Debtors have agreed to sell such HP printers and related equipment to the Purchaser on the following terms:

- The Purchaser shall pay the Debtors $450,000 in Cash on the Effective Date.

- The Purchaser shall authorize, at no incremental cost to the Debtors or the Wind-Down Debtor, the provision of services by former Fast Radius employees for the benefit of the Debtors and Wind-Down Debtor in relation to:

> (i) the preparation of monthly operating reports and other required reporting in connection with these chapter 11 cases;

> (ii) segregating accounts payable as and when invoiced in relation to pre- and post-Closing Date matters;

> (iii) preparation of final tax returns and coordination with the payroll service provider in respect of tax returns, required reporting obligations, and other forms;

> (iv) cooperation with respect to the Debtors' exiting the Goose Island lease location by no later than December 31, 2022; and

> (v) continued access to management-level personnel in respect of the Wind Down after the Effective Date.

- With respect to subpart (iii) above, Purchaser shall assume liabilities, up to $50,000, for an outside accounting firm acceptable to the Wind-Down Debtor.

Confirmation shall be deemed approval of the foregoing sale transaction.

7.10 **Creditors' Committee**. On the Effective Date, the Committee, to the extent then in existence, will be deemed dissolved and cease to exist. The dissolution of the Committee as provided herein shall not prevent any Professional from filing a Professional Fee Claim for service provided to the Committee prior to the Effective Date.

7.11    **Closing the Chapter 11 Cases**.  Upon the occurrence of the Effective Date, all of the Chapter 11 Cases, except for the Chapter 11 Case of Debtor Fast Radius Operations, Inc., shall be deemed closed, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Debtor Fast Radius Operations, Inc.  When all or substantially all of remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Debtor Fast Radius Operations, Inc. in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**ARTICLE VIII**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

8.1    **Compromise, Settlement, and Release of Claims and Interests**.  As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interest of the Debtors and their Estates. Subject to Article X hereof, all distributions to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

8.2    **Release of Liens.**

**Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property . of the Estates shall be fully released, settled, compromised, and satisfied, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Wind-Down Debtor to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency**

53

or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

8.3    **Releases by the Debtors**.

Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Debtors and the Wind-Down Debtor, on their own behalf and as a representative of the Estates, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or Contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are or may be based in whole or in part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors (including the management, ownership, or operation thereof, including as such entities existed prior to or after the Petition Date), the Chapter 11 Cases, negotiation, preparation, Filing, and consummation of the Sale Transaction, the marketing and sale process related to the Sale Transaction, the negotiation, preparation, dissemination, solicitation, and Filing of this Combined Disclosure Statement and Plan, the Filing of the Chapter 11 Cases, the settlement of Claims or renegotiation of Executory Contracts or Leases, the pursuit of confirmation of this Combined Disclosure Statement and Plan, the consummation of this Combined Disclosure Statement and Plan, or the administration of this Combined Disclosure Statement and Plan or the property to be Distributed under this Combined Disclosure Statement and Plan, the Wind Down, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date (including before the Petition Date) related or relating to the foregoing, that may be asserted by or on behalf of any of the Debtors or their respective Estates, against any of the Released Parties; *provided* that any right to enforce the Purchase Agreement, the Plan, and Confirmation Order is not so released.

8.4    **Third-Party Release**.

Effective as of the Effective Date, for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, the adequacy of which is hereby confirmed, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to, completely, conclusively, absolutely, unconditionally, irrevocably, and forever, release, waive, void and extinguish each Debtor, Wind-Down Debtor, and Released Party from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability whatsoever (including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors and their Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, for any act or omission in connection with, relating to, or arising out of the Debtors (including the management,

54

ownership, or operation thereof, including as such entities existed prior to or after the Petition Date), the Chapter 11 Cases, negotiation, preparation, Filing, and consummation of the Sale Transaction, the marketing and sale process related to the Sale Transaction, the negotiation, preparation, dissemination, solicitation, and Filing of this Combined Disclosure Statement and Plan, the Filing of the Chapter 11 Cases, the settlement of Claims or renegotiation of Executory Contracts or Leases, the pursuit of confirmation of this Combined Disclosure Statement and Plan, the consummation of this Combined Disclosure Statement and Plan, or the administration of this Combined Disclosure Statement and Plan or the property to be Distributed under this Combined Disclosure Statement and Plan, the Wind Down, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date (including before the Petition Date) related or relating to the foregoing; *provided* that any right to enforce the Purchase Agreement, the Plan, and Confirmation Order is not so released.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Section 8.7 hereof, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Section 8.7 is:  (1) by virtue of the opt-out procedure, fully consensual; (2) in exchange for the good and valuable consideration provided by the Released Parties; (3) a good-faith settlement and compromise of claims released; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the releases described herein.

8.5     **Exculpation**.

Notwithstanding anything to the contrary herein, effective as of the Effective Date, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is released and exculpated from, any liability to any Entity for any claims or Causes of Action arising prior to or on the Effective Date (including prior to the Petition Date) for any act taken or omitted to be taken in connection with, or related to, preparing and filing the Chapter 11 Cases, or formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the confirmation or consummation of the Sale Transaction or the Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases, the Disclosure Statement, consummation of the Sale Transaction, or confirmation or consummation of the Plan, except for actions determined by Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation

of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

        8.6    **Injunction**.

        **Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims against or Interests in the Debtors that have been released, satisfied, or are subject to exculpation are permanently enjoined, from and after the Effective Date from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtor, the Exculpated Parties, the Released Parties, or the Plan Administrator: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) on account of or in connection with or with respect to any such Claim or Interest; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order on account of or in connection with or with respect to any such Claim or Interest; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind on account of or in connection with or with respect to any such Claim or Interest; (iv) asserting any right of setoff, directly or indirectly, on account of or in connection with or with respect to any such Claim or Interest, except as contemplated or allowed by this Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan.**

        **Upon entry of the Confirmation Order, all Holders of Claims and Interests and their Related Parties shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions, treatment, or reinstatement of such Claim or Interest, as applicable, pursuant to the Plan shall be deemed to have consented to the injunction provisions set forth in Section 8.7 hereof.**

        8.7    **Consensual Non-Debtor Releases**.  Nothing in the Plan is intended to, nor shall the Plan be interpreted to, effect a nonconsensual release by a Holder of a Claim or Interest in favor of a party that is not a Debtor, it being acknowledged that such Holder shall be deemed to release a party that is not a Debtor under the Plan solely to the extent that such holder consensually elects to provide such Plan release in accordance with the opt-out release procedures set forth in any applicable Ballot or notice.

        8.8    **Releases Subject to Investigation**.  The releases and related provisions set forth in this Article VIII remain subject to the Debtors' ongoing investigation of potential claims held by the Estates.

        8.9    **Indemnification Obligations**.  Except as otherwise provided in a previously entered Order of the Bankruptcy Court, this Plan, or any contract, instrument, release, or other agreement or document entered into in connection with this Plan, any and all indemnification obligations that the Debtors have pursuant to a contract, instrument, agreement,

certificate of incorporation, by-law, comparable organizational document or any other document, or applicable law, shall be rejected as of the Effective Date, to the extent executory. Nothing in this Plan shall be deemed to release the Debtors' insurers from, or limit the obligations of any of the Debtors' insurers concerning any claims that might be asserted by insureds, additional insureds, or counter-parties to contracts or agreements providing for the indemnification by and of the Debtors, to the extent of available coverage. To the extent that this Section 8.9 alters, affects, impairs, limits or otherwise modifies any insurance coverage of any person, this Section 8.9 shall be of no force and effect as to the insurance coverage of such person.

8.10    **Setoffs**. Except for Claims expressly allowed hereunder, on or after the Effective Date, the Wind-Down Debtor, may, pursuant to applicable law (including section 553 of the Bankruptcy Code), offset against any Claim, including an Administrative Claim, before any Distribution is made on account of such Claim, any and all of the claims, rights and Causes of Action of any nature that the Debtors or the Wind-Down Debtor may hold against the Holder of such Claim.

8.11    **Binding Effect**. This Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Wind-Down Debtor and the Plan Administrator.

8.12    **Terms of Injunctions or Stays**. Unless otherwise provided in this Plan, all injunctions or stays provided for in these Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until these Chapter 11 Cases are closed.

## ARTICLE IX
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1    **Rejection of Executory Contracts and Unexpired Leases**. Except as otherwise provided in the Confirmation Order, this Plan, any other Plan Document, the Sale Order, the Bar Date Order, or any other relevant order of the Bankruptcy Court, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code rejecting all prepetition Executory Contracts or Leases to which any Debtor is a party, to the extent such contracts or leases are Executory Contracts or Leases, on and subject to the occurrence of the Effective Date, unless such contract or lease is expressly assumed hereunder or previously shall have been assumed or assumed and assigned by the Debtors, or (b) is the subject of a pending motion to reject on the Confirmation Date; *provided*, *however*, that as to all policies and agreements giving rise to insurance in favor of the Debtors or their Estates, the Debtors believe that the insurance agreements of the Debtors are not Executory Contracts or Leases and therefore are not subject to assumption or rejection. To the extent that an insurance policy or agreement is determined to be an Executory Contract or Lease subject to assumption by the Debtors, such executory insurance policy or agreement, as the case may be, is hereby assumed and assigned to, and shall vest with, the Wind-Down Debtor. For the avoidance of doubt, all insurance policies and agreements of the Debtors, and all obligations of any of the Debtors and the other counterparties thereto, shall be unaffected by the Plan and shall remain enforceable according to their terms and applicable law.

9.2    **Supplemental Bar Date for Rejection Damages**.  If the rejection of any Executory Contract or Lease under this Plan gives rise to a Claim by the non-Debtor party or parties to such Executory Contract or Lease, such Claim, to the extent that it is timely filed and is an Allowed Claim, shall be classified in Class 4; *provided*, *however*, that any potential General Unsecured Claim arising from such rejection shall be forever barred and shall not be enforceable against the Debtors, the Wind-Down Debtor, their successors or properties, unless a proof of such Claim is filed and served on the Debtors or the Wind-Down Debtor, as applicable, within thirty (30) days after the date of notice of the entry of the order of the Bankruptcy Court rejecting the Executory Contract or Lease (which may include the Confirmation Order).

## ARTICLE X
## DISTRIBUTIONS

10.1    **Distributions for Claims Allowed as of the Effective Date**.  Except as otherwise provided herein, and only after the funding of the Reserves, or as ordered by the Bankruptcy Court, all Distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on a Distribution Date.  Distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made pursuant to the terms and conditions of this Plan.  Notwithstanding any other provision of this Plan to the contrary, no Distribution shall be made on account of any Claim or portion thereof that (i) has been satisfied after the Petition Date pursuant to an order of the Bankruptcy Court; (ii) is listed in the Schedules as contingent, unliquidated, disputed or in a zero amount, and for which a proof of Claim has not been timely filed; or (iii) is evidenced by a proof of Claim that has been amended by a subsequently filed proof of Claim that purports to amend the prior proof of Claim.

10.2    **No Distributions on Disputed Claims**.  No Distribution shall be made by the Wind-Down Debtor with respect to a Disputed Claim until the same, or some portion thereof, becomes an Allowed Claim.

10.3    **Distributions on Claims Allowed after the Effective Date**.  Payments and Distributions from the Wind-Down Debtor to each respective Holder on account of a Disputed Claim, to the extent that such Disputed Claim ultimately becomes an Allowed Claim, shall be made in accordance with provisions of this Plan that govern Distributions to such Holders of Allowed Claims.  Except as otherwise provided in this Plan, within ninety (90) days after such Disputed Claim becomes an Allowed Claim, the Wind-Down Debtor shall distribute to such Holder any property from the applicable Reserve or the Wind-Down Debtor that would have been distributed on the dates Distributions were previously made to Holders of Allowed Claims if such Disputed Claim had been an Allowed Claim on such dates.

All Distributions made under this Article X on account of an Allowed Claim will be as if such Disputed Claim had been an Allowed Claim on the dates Distributions were previously made to Holders of Allowed Claims included in the applicable Class.

10.4    **Objections to and Estimation of Claims**.  Unless otherwise provided in this Plan, after the Effective Date, the Wind-Down Debtor shall have sole and exclusive standing to object to Claims in order to have the Bankruptcy Court determine the amount and treatment of any Claim.  From and after the Effective Date, the Plan Administrator may settle or compromise

any Disputed Claim without approval of the Bankruptcy Court. Except as otherwise provided in this Plan, if a party files a Proof of Claim and (i) the Debtors or the Wind-Down Debtor, as applicable, file an objection to that Claim or otherwise formally challenge the Claim or (ii) the Claim otherwise is a Disputed Claim under this Plan, then such Claim shall be Disputed unless Allowed or Disallowed by a Final Order or as otherwise set forth in this Plan. Except as otherwise provided in this Plan, all Proofs of Claim filed after the Effective Date shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Debtors or the Estates, without the need for any objection by the Plan Administrator or any further notice to or action, order, or approval of the Bankruptcy Court.

   10.5 **Delivery of Distributions and Undeliverable or Unclaimed Distributions**.

   (a) **Delivery of Distributions in General**. Distributions to Holders of Allowed Claims shall be made at such Holder's Distribution Address.

   Distributions shall be made from the Wind-Down Debtor, as applicable, in accordance with the terms of this Plan.

   In making Distributions under this Plan, the Plan Administrator may rely upon the accuracy of the claims register maintained by the Claims Agent in the Case, as modified by any Final Order of the Bankruptcy Court disallowing Claims in whole or in part.

   (b) **Undeliverable and Unclaimed Distributions**. If the Distribution to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise an Unclaimed Distribution, no further Distributions shall be made to such Holder unless and until the Plan Administrator is notified in writing of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest. If a Distribution is returned as undeliverable, the Plan Administrator shall use reasonable efforts to determine such Creditor's then-current address. Unclaimed Distributions shall be returned to the Wind-Down Debtor until such Distributions are claimed.

   (c) **Treatment of Unclaimed Distributions**. Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an Unclaimed Distribution within three (3) months after the final Distribution Date shall be deemed to have forfeited its Claim for such undeliverable or unclaimed Distribution and shall be forever barred and enjoined from asserting any such Claim for an Unclaimed Distribution against the Debtors and their Estates, the Plan Administrator, the Wind-Down Debtor, and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of its and their property. In such cases, any Cash otherwise reserved for Unclaimed Distributions shall become the property of the Wind-Down Debtor free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be distributed in accordance with the terms of this Plan. Nothing contained in this Plan shall require the Debtors or the Plan Administrator to attempt to locate any Holder of an Allowed Claim; *provided*, *however*, that in his / her sole discretion, the Plan Administrator may periodically publish notice of Unclaimed Distributions.

10.6    **Interest on Claims**.  Except as specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim.  Except as specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

10.7    **Withholding and Reporting Requirements**.  In connection with this Plan and all Distributions under this Plan, the Plan Administrator shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding, payment, and reporting requirements.  The Plan Administrator shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.  All amounts properly withheld from Distributions to a Holder as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder.

All Entities holding Claims shall be required to provide any information necessary to effect information reporting and withholding of such taxes.  No Distribution shall be made to or on behalf of such Entity pursuant to this Plan unless and until such Entity has furnished such information.  Any property to be distributed pursuant to this Plan shall be deemed: (i) pending the receipt of such information in the manner established by the Plan Administrator, an Undeliverable Distribution pursuant to Section 10.5 of this Plan; or (ii) if such information is not received by the deadline established by the Plan Administrator and approved by the Bankruptcy Court upon notice and a hearing, forfeited and treated in accordance with Section 10.5 of this Plan.

Notwithstanding any other provision of this Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Plan Administrator for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Plan Administrator in connection with such Distribution.  Any property to be distributed pursuant to this Plan shall be deemed:  (i) pending the implementation of such arrangements, an Undeliverable Distribution pursuant to Section 10.5 of this Plan; or (ii) if such arrangements are not implemented by the deadline established by the Wind-Down Debtor and approved by the Bankruptcy Court upon notice and a hearing, forfeited and treated in accordance with Section 10.5 of this Plan.

10.8    **Miscellaneous Distribution Provisions**.

(a)    **Method of Cash Distributions**.  Any Cash payment to be made by the Wind-Down Debtor pursuant to this Plan will be in U.S. dollars and may be made, at the sole discretion of the Plan Administrator, by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law.  In the case of foreign creditors, Cash

payments may be made, at the option of the Wind-Down Debtor, in such funds and by such means as are necessary or customary in a particular jurisdiction.

(b)     **Distributions on Non-Business Days**.  Any payment or Distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

10.9    *De Minimis Distribution Provisions*.  No Distribution shall be required to be made hereunder to any Holder of a Claim unless such Holder is to receive in such Distribution at least $100.  Any such Distribution not made in accordance with the provisions of this Article X shall be retained by the Wind-Down Debtor and invested as provided in this Plan.  Any Distribution not made in accordance with this Article X to such Holder, shall be held in trust for the relevant Holder until the earlier of (x) the date the next Distribution is scheduled to be made to such Holder; *provided, however*, that such subsequent Distribution, taken together with amounts retained hereby, equals at least $100.

10.10   **Distribution Record Date**.  As of the close of business on the Distribution Record Date, the various lists of Holders of Claims and Interests in each of the Classes, as maintained by the Debtors, or their agents, shall be deemed closed and there shall be no further changes in the record Holders of any of the Claims or Interests.  Neither the Wind-Down Debtor nor the Plan Administrator will have any obligation to recognize the transfer of or sale of any participation in any Allowed Claim that occurs after the close of business on a Distribution Record Date, and will be entitled for all purposes herein to recognize, deal with and distribute only to those Holders of Allowed Claims who are record Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date, as stated on the official claims register.

## ARTICLE XI
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

11.1    **Conditions to Effective Date**.  The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtors in writing:

(a)     the Bankruptcy Court shall have entered the Confirmation Order;

(b)     the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

(c)     the Reserves shall have been established and funded in accordance with the Plan; and

(d)     the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated herein in a manner consistent in all respects with the Plan.

11.2    **Substantial Consummation**.  "Substantial Consummation" of the Plan, as defined in sections 1101 and 1127 of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

11.3    **Consequences of Non-Occurrence of Effective Date**.  If the Effective Date does not timely occur, the Debtors reserve all rights to seek an order form the Bankruptcy Court directing that the Confirmation Order be vacated and that this Plan be null and void in all respects.  If the Bankruptcy Court shall have entered an order vacating the Confirmation Order, the time within which the Debtors may assume and assign or reject all Executory Contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated, without prejudice to further extensions.

**ARTICLE XII**
**ADMINISTRATIVE PROVISIONS**

12.1    **Retention of Jurisdiction**.  Notwithstanding confirmation of this Plan or occurrence of the Effective Date, and except as otherwise provided by applicable law, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including for the following purposes:

(a)    To determine the allowability, classification, or priority of Claims upon objection of the Debtors, the Wind-Down Debtor, the Plan Administrator, or any other party in interest entitled to file an objection, and the validity, extent, priority and nonavoidability of consensual and nonconsensual liens and other encumbrances;

(b)    To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any Entity, to construe and to take any other action to enforce and execute this Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of this Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Case on or before the Effective Date with respect to any Entity;

(c)    To protect the property of the Estates, from claims against, or interference with, such property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens on property of the Estates;

(d)    To determine any and all applications for allowance of Professional Fee Claims;

(e)    To determine any Administrative Claims, Priority Tax Claims, Other Priority Claims, or any other request for payment of claims or expenses entitled to priority under section 507(a) of the Bankruptcy Code;

(f)    To resolve any disputes arising under or related to the implementation, execution, consummation or interpretation of this Plan and the making of Distributions hereunder;

(g)    To determine any and all motions related to the rejection, assumption or assignment of Executory Contracts or unexpired leases, or to determine any motion to reject an Executory Contract or unexpired lease;

62

(h)     To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Cases, including any remands;

(i)     To enter one or more Final Orders closing the Debtors' Chapter 11 Cases;

(j)     To modify this Plan under section 1127 of the Bankruptcy Code, to remedy any defect, cure any omission, or reconcile any inconsistency in this Plan or the Confirmation Order so as to carry out its intent and purposes;

(k)     To issue such orders in aid of consummation of this Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity, to the full extent authorized by the Bankruptcy Code;

(l)     To enable the Wind-Down Debtor to prosecute any and all proceedings to set aside Liens and to recover any transfers, assets, properties or damages to which the Estates may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws except as may be expressly waived pursuant to this Plan;

(m)     To determine any tax liability of the Debtors or the Wind-Down Debtor pursuant to section 505 of the Bankruptcy Code, and to address any request by the Wind-Down Debtor for a prompt audit pursuant to section 505(b) of the Bankruptcy Code;

(n)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(o)     To resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Bar Date Order, or the otherwise applicable Claims bar date, the hearing to consider approval of the Combined Disclosure Statement and Plan or the Confirmation Hearing;

(p)     To resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in these Chapter 11 Cases;

(q)     To authorize sales of assets as necessary or desirable and resolve objections, if any, to such sales;

(r)     To hear and resolve Claims and Retained Actions;

(s)     To resolve any disputes concerning any exculpation of a non-debtor hereunder or the injunction against acts, employment of process or actions against such non-debtor arising hereunder;

(t)     To approve any Distributions, or objections thereto, under this Plan;

(u)     To approve any Claims settlement entered into or offset exercised by the Wind-Down Debtor; and

EAST\198340363.11

(v)     To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

12.2     **Preservation of Exclusivity.**    By jointly proposing this Combined Disclosure Statement and Plan, the Debtors are not waiving their exclusive rights to file and solicit acceptances of a chapter 11 plan under section 1121 of the Bankruptcy Code.

12.3     **Amendments**.

(a)     **Preconfirmation Amendment**.   The Debtors, in the exercise of their fiduciary duties, may modify this Plan at any time prior to the entry of the Confirmation Order, provided that this Combined Disclosure Statement and Plan, as modified, meet applicable Bankruptcy Code requirements.

(b)     **Postconfirmation Amendment Not Requiring Resolicitation**.  After the entry of the Confirmation Order, the Debtors may modify this Plan to remedy any defect or omission or to reconcile any inconsistencies in this Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of this Plan, provided that such modification shall not materially and adversely affect the interests, rights, treatment or Distributions of any Class of Allowed Claims or Interests under this Plan.

12.4     **Withdrawal of Plan**.  The Debtors reserve the right to revoke and withdraw or modify this Plan at any time prior to the Confirmation Date in the exercise of their fiduciary duties or, if the Debtors are for any reason unable to consummate this Plan after the Confirmation Date, at any time up to the Effective Date.  If the Debtors revoke or withdraw this Plan, (a) nothing contained in this Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtors or to prejudice in any manner the rights of the Debtors or any Entity in any further proceeding involving the Debtors and (b) the result shall be the same as if the Confirmation Order were not entered, this Plan was not filed and the Effective Date did not occur.

12.5     **Successors and Assigns**.  The rights, benefits and obligations of any person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such person or Entity.

12.6     **Governing Law**.   Except to the extent that the Bankruptcy Code, Bankruptcy Rules or other federal laws apply, the rights and obligations arising under this Plan shall be governed by and construed and enforced in accordance with the laws of the State of New York, without giving effect to principles of conflicts of law.

12.7     **Corporate Action**.  Any matters provided for under this Plan involving the corporate structure of the Debtors or corporate action, as the case may be, to be taken by or required of the Debtors shall be deemed to have occurred and be effective as of the Effective Date and shall be authorized and approved in all respects, without any requirement of further action by the Debtors or the Wind-Down Debtor, as the case may be.

12.8     **Effectuating Documents and Further Transactions**.  The Debtors and the Wind-Down Debtor shall be authorized to execute, deliver, file, or record such documents,

64

contracts, instruments, releases, and other agreements and take such other actions as they deem necessary to effectuate and further evidence the terms and conditions of this Plan.

12.9 **Confirmation Order and Plan Control**. To the extent the Confirmation Order is inconsistent with this Plan, the Confirmation Order (and any other orders of the Bankruptcy Court) controls over this Plan.

12.10 **Notices**. All notices or requests in connection with this Plan shall be in writing and will be deemed to have been given when received by mail and addressed to:

**Debtors**:                                    **Plan Administrator:**

DLA PIPER LLP (US)                              [___]
R. Craig Martin
1201 North Market Street, Suite 2100
P.O. Box 1347
Wilmington, Delaware 19801
Tel:  (302) 468-5700
Fax: (302) 394-2341
craig.martin@us.dlapiper.com

Rachel Ehrlich Albanese
1251 Avenue of the Americas
New York, New York 10020
Tel:  (212) 335-4500
Fax: (212) 335-4501
rachel.albanese@us.dlapiper.com

W. Benjamin Winger (admitted *pro hac vice*)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Email: benjamin.winger@us.dlapiper.com

12.11 **No Admissions or Waiver**. Notwithstanding anything herein to the contrary, nothing contained in this Plan shall be deemed an admission or waiver by the Debtors with respect to any matter set forth herein, including liability on any Claim or the propriety of a Claim's classification.

**ARTICLE XIII**
**RECOMMENDATION AND CONCLUSION**

The Debtors believe that this Combined Disclosure Statement and Plan is in the best interests of the Estates and creditors and urge the Holders of Impaired Claims who are entitled to vote to timely return their Ballots with a vote in favor of this Combined Disclosure Statement and Plan.

**FAST RADIUS, INC.**


By:  /s/ Patrick McCusker
       Name:  Patrick McCusker
       Title:  Authorized Signatory

**FAST RADIUS OPERATIONS, INC.**


By:  /s/ Patrick McCusker
       Name:  Patrick McCusker
       Title:  Authorized Signatory

**FAST RADIUS PTE. LTD.**

By:  /s/ Patrick McCusker
       Name:  Patrick McCusker
       Title:  Authorized Signatory

EAST\198340363.11